PINTER ET AL. *v.* DAHL ET AL.

No. 86–805.   Argued December 9, 1987—Decided June 15, 1988

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 655. KENNEDY, J., took no part in the consideration or decision of the case.

*Braden W. Sparks* argued the cause and filed briefs for petitioners. *Richard G. Taranto* argued the cause for the Securities and Exchange Commission as *amicus curiae* in support of petitioners. With him on the brief were *Solicitor General Fried, Deputy Solicitor General Cohen, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman,* and *Max Berueffy.*

*John A. Spinuzzi* argued the cause for respondents. With him on the brief was *Michael F. Linz.*

JUSTICE BLACKMUN delivered the opinion of the Court.

The questions presented by this case are (a) whether the common-law *in pari delicto* defense is available in a private

action brought under § 12(1) of the Securities Act of 1933 (Securities Act), 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.*, for the rescission of the sale of unregistered securities, and (b) whether one must intend to confer a benefit on himself or on a third party in order to qualify as a "seller" within the meaning of § 12(1).

I

The controversy arises out of the sale prior to 1982 of unregistered securities (fractional undivided interests in oil and gas leases) by petitioner Billy J. "B. J." Pinter to respondents Maurice Dahl and Dahl's friends, family, and business associates.[1] Pinter is an oil and gas producer in Texas and Oklahoma, and a registered securities dealer in Texas. Dahl is a California real estate broker and investor, who, at the time of his dealings with Pinter, was a veteran of two unsuccessful oil and gas ventures. In pursuit of further investment opportunities, Dahl employed an oil field expert to locate and acquire oil and gas leases. This expert introduced Dahl to Pinter. Dahl advanced $20,000 to Pinter to acquire leases, with the understanding that they would be held in the name of Pinter's Black Gold Oil Company and that Dahl would have a right of first refusal to drill certain wells on the leasehold properties. Pinter located leases in Oklahoma, and Dahl toured the properties, often without Pinter, in order to talk to others and "get a feel for the properties." App. to Pet.

---

[1] Petitioners are Pinter, individually and d.b.a. Black Gold Oil Company, Pinter Energy Company, and Pinter Oil Company. Throughout this opinion, we often refer to petitioners collectively as "Pinter."

Respondents are Maurice Dahl, Gary Clark, W. Grantham, Robert J. Daniele, Charles Dahl, Dowayne C. Bockman, Ray Dilbeck, Richard Koon, Art Overgaard, Jack Yeager, Accra Tronics Seals Corp., and Aaron Heller. These are Dahl's brother, his accountant, his partner in a construction business, the bank officer handling his construction loans, his construction-business insurance agent, a business owned by a longtime friend, and other business associates and friends of Maurice Dahl. See App. 101–104.

for Cert. 32.   Upon examining the geology, drilling logs, and production history assembled by Pinter, Dahl concluded, in the words of the District Court, that "there was no way to lose."   *Ibid.*

After investing approximately $310,000 in the properties, Dahl told the other respondents about the venture.   Except for Dahl and respondent Grantham, none of the respondents spoke to or met Pinter or toured the properties.   Because of Dahl's involvement in the venture, each of the other respondents decided to invest about $7,500.[2]

Dahl assisted his fellow investors in completing the subscription-agreement form prepared by Pinter.   Each letter-contract signed by the purchaser stated that the participating interests were being sold without the benefit of registration under the Securities Act, in reliance on Securities and Exchange Commission (SEC or Commission) Rule 146, 17 CFR § 230.146 (1982).[3]   In fact, the oil and gas interests involved in this suit were never registered with the Commission.   Respondents' investment checks were made payable to Black Gold Oil Company.   Dahl received no commission from Pinter in connection with the other respondents' purchases.

---

[2] The venture included still others who were either interested in additional ventures organized by Pinter or were new investors who met Pinter through sources other than Dahl.   Those investors are not parties to this litigation.

[3] Specifically, each document recited:

"WHEREAS the parties constitute a predetermined and limited group of sophisticated and knowledgeable well informed investors who desire to arrange for participation in an oil and/or gas drilling venture as an investment and do declare that it is not for the purpose of reselling their interest therein.   (These participating interests are being sold without the benefit of registration under the Securities Act of 1933, as amended, and on reliance of rule 146 thereunder)."   App. 95.

See also n. 4, *infra.*

Rule 146 was rescinded, effective June 30, 1982, by SEC Release No. 33–6389, 47 Fed. Reg. 11251 (1982), and superseded by provisions of Regulation D, 17 CFR, p. 425 (1987).

When the venture failed and their interests proved to be worthless, respondents brought suit against Pinter in the United States District Court for the Northern District of Texas, seeking rescission under § 12(1) of the Securities Act, 15 U. S. C. § 77*l*(1), for the unlawful sale of unregistered securities.[4]

---

[4] Section 12 provides:

"Any person who—(1) offers or sells a security in violation of section [5] . . . shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

Section 5, 15 U. S. C. § 77e, referred to in § 12, states, in pertinent part, that if a security is unregistered, it is unlawful for a person to sell or deliver the security in interstate commerce.

A number of exemptions, however, enable an issuer to avoid the registration requirement of the Securities Act. One of these, § 4(2), 15 U. S. C. § 77d(2), commonly referred to as the "private-offering" exemption, relieves from registration "transactions by an issuer not involving any public offering." See *SEC* v. *Ralston Purina Co.*, 346 U. S. 119 (1953) (establishing criteria for determining whether an offering fits the private-offering exemption).

In 1974, the Commission sought to provide "objective standards" under § 4(2) by adopting Rule 146. Rule 146—Transactions by an Issuer Deemed Not to Involve Any Public Offering, Securities Act Rel. No. 33–5487 (effective June 10, 1974), 39 Fed. Reg. 15261 (1974), CCH Fed. Sec. L. Rep. ¶ 2710, p. 2902. It has been said that the Rule, which is now superseded by provisions of Regulation D, see n. 3, *supra*, provided that a transaction by an issuer would not be deemed to involve a public offering within the meaning of § 4(2) if it was part of an offering that met the following conditions:

"[T]he offering must 1) not be made by any means or form of general solicitation or advertising; 2) be made only to those persons whom the issuer has reasonable grounds to believe are of knowledge and experience which would enable them to evaluate the merits of the issue or who are financially able to bear the risk; 3) be made only to those persons who have access to the same kind of information as would be contained in a registration statement. Under this rule, the issuer must have reasonable grounds to believe, and must believe, that there are no more than thirty-five purchasers

In a counterclaim, Pinter alleged that Dahl, by means of fraudulent misrepresentations and concealment of facts, induced Pinter to sell and deliver the securities. Pinter averred that Dahl falsely assured Pinter that he would provide other qualified, sophisticated, and knowledgeable investors with all the information necessary for evaluation of the investment. Dahl allegedly agreed to raise the funds for the venture from those investors, with the understanding that Pinter would simply be the "operator" of the wells. App. 69–73.[5] Pinter also asserted, on the basis of the same factual allegations, that Dahl's suit was barred by the equitable defenses of estoppel and *in pari delicto*. *Id.*, at 66–67.[6]

The District Court, after a bench trial, granted judgment for respondent-investors. *Id.*, at 92. The court concluded that Pinter had not proved that the oil and gas interests were entitled to the private-offering exemption from registration. App. to Pet. for Cert. a–37. Accordingly, the court ruled

---

from the issuer." *Mary S. Krech Trust* v. *Lakes Apartments*, 642 F. 2d 98, 101 (CA5 1981).

See 3 H. Bloomenthal, Securities and Federal Corporate Law § 4.05[2] (1981 ed.). Pinter sought to take advantage of this "safe harbor" in issuing the oil and gas interests involved in this case.

In addition to their § 12(1) claim, respondents alleged that Pinter made material misrepresentations regarding the oil and gas properties and his oil experience, thereby entitling them to damages under § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j(b), and SEC Rule 10b–5 thereunder, 17 CFR § 240.10b–5 (1987), and to rescission under § 12(2) of the Securities Act, 15 U. S. C. § 77l(2). Respondents also asserted pendent claims under Texas and California law. None of these additional claims is before us.

[5] Pinter apparently meant to contend that Dahl was responsible for the loss of the private-offering exemption from registration under § 4(2) and Rule 146, see n. 4, *supra*, although Pinter did not make this assertion explicit in his pleadings. Cf. Second Amended Proposed Findings of Fact and Conclusions of Law of Defendants Billy J. "B. J." Pinter, et al., App. 85–86 (claiming that petitioners had met the requirements of the private-offering exemption).

[6] Pinter contended that all the respondents should be estopped from recovery because of Dahl's fraudulent conduct. He asserted his *in pari delicto* defense solely against Dahl.

that, because the securities were unregistered, respondents were entitled to rescission pursuant to § 12(1).  *Ibid.*[7]  The court also concluded that the evidence was insufficient to sustain Pinter's counterclaim against Dahl.  The District Court made no mention of the equitable defenses asserted by Pinter, but it apparently rejected them.

A divided panel of the Court of Appeals for the Fifth Circuit affirmed.  787 F. 2d 985 (1986).  The court first held that Dahl's involvement in the sales to the other respondents did not give Pinter an *in pari delicto* defense to Dahl's recovery.  *Id.*, at 988.[8]  The court concluded that the defense is not available in an action under § 12(1) because that section creates "a strict liability offense" rather than liability based on intentional misconduct.  It thereby distinguished our recent decision in *Bateman Eichler, Hill Richards, Inc.* v. *Berner*, 472 U. S. 299 (1985), where we held that the *in pari delicto* defense is applicable in an action under § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j(b), which contains an element of scienter.  Noting that Dahl was "as 'culpable' as Pinter in the sense that his conduct was an equal producing cause of the illegal transaction," the court nevertheless held that "[a]bsent a showing that Dahl's conduct was 'offensive to the dictates of natural justice,'" the *in pari delicto* defense was not available.  787 F. 2d, at 988, quoting *Keystone Driller Co.* v. *General Excavator Co.*, 290 U. S. 240, 245 (1933).

The Court of Appeals next considered whether Dahl was himself a "seller" of the oil and gas interests within the meaning of § 12(1), for if he was, the court assumed, he could be held liable in contribution for the other plaintiffs' claims

---

[7] Having reached this conclusion, the District Court found it unnecessary to consider respondents' § 12(2) claim.  App. to Pet. for Cert. 37–38.  The court rejected respondents' claim under § 10(b) and Rule 10b–5.  App. to Pet. for Cert. a–37.

[8] The court also rejected Pinter's estoppel defense.  787 F. 2d, at 988–989.  That holding is not challenged in this Court.  We express no view as to whether this equitable defense is available in a § 12(1) action.

against Pinter.[9]   787 F. 2d, at 990, and n. 8.   Citing Fifth Circuit precedent, the court described a statutory seller as "(1) one who parts with title to securities in exchange for consideration or (2) one whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place." *Id.*, at 990.   While acknowledging that Dahl's conduct was a "substantial factor" in causing the other plaintiffs to purchase securities from Pinter, the court declined to hold that Dahl was a "seller" for purposes of § 12(1).   Instead, the court went on to refine its test to include a threshold requirement that one who acts as a "promoter" be "motivated by a desire to confer a direct or indirect benefit on someone other than the person he has advised to purchase." 787 F. 2d, at 991.   The court reasoned that "a rule imposing liability (without fault or knowledge) on friends and family members who give one another gratuitous advice on investment matters unreasonably interferes with well-established patterns

---

[9] Because none of the other plaintiffs sought recovery from Dahl, Dahl's liability on their claims is at issue only if contribution is available to Pinter.

The Court of Appeals addressed Pinter's contention that Dahl was liable as a § 12(1) seller and thus should be accountable to Pinter in contribution for the amounts awarded to the other plaintiffs.   787 F. 2d, at 987.   It is not entirely clear how this claim was raised below.   Pinter's pleadings do not state an explicit cause of action for contribution against Dahl, although Pinter did move, albeit unsuccessfully, to realign Dahl as a third-party defendant, based on Pinter's assertion that Dahl was a "seller" of the unregistered securities to the remaining plaintiffs and had made the allegedly actionable misrepresentations to them in connection with the sales.   See 1 Record 164–165, 189.   Presumably, the Court of Appeals construed Pinter's affirmative defense for contributory fault and his incorporation of this defense into his counterclaims, as effectively seeking contribution.

Unlike § 11 of the Securities Act, see 15 U. S. C. § 77k(f), § 12 does not expressly provide for contribution.   The Court of Appeals did not reach the question whether Pinter is entitled to contribution under § 12(1) because it found that Dahl was not a seller for purposes of § 12(1), and therefore would not be the proper subject of a contribution claim.   The parties have not raised or addressed the contribution issue before this Court, and we express no view as to whether a right of contribution exists under § 12(1).

of social discourse." *Ibid.* Accordingly, since the court found no evidence that Dahl sought or received any financial benefit in return for his advice, it declined to impose liability on Dahl for "mere gregariousness." *Ibid.*

The dissenting judge took issue with the majority's analysis on both points. First, assuming that this Court's decision in *Bateman Eichler* applied to all securities cases, the dissent concluded that Dahl's suit should be barred by the *in pari delicto* doctrine because Dahl was a "catalyst" for the entire transaction and knew that the securities were unregistered. 787 F. 2d, at 991. In addition, the dissent maintained that Dahl's conduct transformed him into a "seller" of unregistered securities to the other plaintiffs under the Fifth Circuit's established "substantial factor" test. *Id.*, at 991–992. It added that, even under the majority's expectation-of-financial-benefit refinement, Dahl's promotional activities rendered him a "seller" because "[m]ore investors means that the investment program receives the requisite amount of financing at a smaller risk to each investor." *Id.*, at 992, n. 3.[10]

The Court of Appeals, by an 8-to-6 vote, denied rehearing en banc. 794 F. 2d 1016 (1986). The judges who dissented from that denial asserted that the panel majority's addition of the financial-benefit requirement to the definition of a "seller," "has absolutely no foundation in either settled securities law or its underlying policies." *Id.*, at 1017. They also criticized the panel majority for misinterpreting *Bateman Eichler* to limit application of the *in pari delicto* doctrine to fraud actions under § 10(b). 794 F. 2d, at 1017.

---

[10] The dissent addressed the "seller" issue in the context of Pinter's asserted *in pari delicto* defense. In its view, Dahl's role as a seller of the unregistered securities "put him in the same boat as Pinter," making him vulnerable to that defense. 787 F. 2d, at 991. The dissent also indicated that it "would go further" and hold that "Pinter is entitled to contribution from Dahl since Dahl is at least equally culpable for the sale to the other plaintiffs." *Id.*, at 995, n. 5.

Because of the importance of the issues involved to the administration of the federal securities laws, we granted certiorari. 481 U. S. 1012 (1987).

## II

The equitable defense of *in pari delicto*, which literally means "in equal fault," is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct. See *Bateman Eichler*, 472 U. S., at 306, and nn. 12 and 13. Traditionally, the defense was limited to situations where the plaintiff bore "at least substantially equal responsibility for his injury," *id.*, at 307, and where the parties' culpability arose out of the same illegal act. 1 J. Story, Equity Jurisprudence 399–400 (14th ed. 1918). Contemporary courts have expanded the defense's application to situations more closely analogous to those encompassed by the "unclean hands" doctrine, where the plaintiff has participated "in some of the same sort of wrongdoing" as the defendant. See *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 138 (1968). In *Perma Life*, however, the Court concluded that this broadened construction is not appropriate in litigation arising under federal regulatory statutes. *Ibid.* Nevertheless, in separate opinions, five Justices recognized that a narrow, more traditional formulation should be available in private actions under the antitrust laws. See *id.*, at 145 (WHITE, J., concurring); *id.*, at 147–148 (Fortas, J., concurring in result); *id.*, at 148–149, 151 (MARSHALL, J., concurring in result); *id.*, at 154–155 (Harlan, J., joined by Stewart, J., concurring in part and dissenting in part).

In *Bateman Eichler*, the Court addressed the scope of the *in pari delicto* defense in the context of an action brought by securities investors under the antifraud provisions of § 10(b) and Rule 10b–5, alleging that the broker-dealer and corporate insider defendants had induced the plaintiffs to purchase large quantities of stock by divulging false and materially incomplete information on the pretext that it was ac-

curate inside information. The defendants argued that the scope should be broader where the private cause of action is implied, as in a § 10(b) action, rather than expressly provided by Congress, as in an antitrust action. The Court rejected this distinction, concluding that "the views expressed in *Perma Life* apply with full force to implied causes of action under the federal securities laws." 472 U. S., at 310. Accordingly, it held that the *in pari delicto* defense is available "only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Id.*, at 310–311. The first prong of this test captures the essential elements of the classic *in pari delicto* doctrine. See *id.*, at 307. The second prong, which embodies the doctrine's traditional requirement that public policy implications be carefully considered before the defense is allowed, see *ibid.*, ensures that the broad judge-made law does not undermine the congressional policy favoring private suits as an important mode of enforcing federal securities statutes. Cf. *Perma Life*, 392 U. S., at 139–140. Applying this test to the § 10(b) claim before it, the Court concluded that in such tipster-tippee situations, the two factors precluded recognition of the *in pari delicto* defense. *Bateman Eichler*, 472 U. S., at 317.

## A

We do not share the Court of Appeals' narrow vision of the applicability of *Bateman Eichler*. Nothing in this Court's opinion in that case suggests that the *in pari delicto* defense is limited to § 10(b) claims. Nor does the opinion suggest that the doctrine applies only when the plaintiff's fault is intentional or willful.

We feel that the Court of Appeals' notion that the *in pari delicto* defense should not be allowed in actions involving

strict liability offenses is without support in history or logic.[11] The doctrine traditionally has been applied in any action based on conduct that "transgresses statutory prohibitions." 2 Restatement of Contracts § 598, Comment a (1932). Courts have recognized the defense in cases involving strict liability offenses. See, e. g., *UFITEC, S. A.* v. *Carter*, 20 Cal. 3d 238, 250, 571 P. 2d 990, 996–997 (1977) (violation of Federal Reserve margin requirements); *Miller* v. *California Roofing Co.*, 55 Cal. App. 2d 136, 130 P. 2d 740 (1942) (sale of stock without permit from State Corporation Commission). One of the premises on which the *in pari delicto* doctrine is grounded is that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler*, 472 U. S., at 306. The need to deter illegal conduct is not eliminated simply because a statute creates a strict liability offense rather than punishing willful or negligent misconduct. Regardless of the degree of scienter, there may be circumstances in which the statutory goal of deterring illegal conduct is served more effectively by preclusion of suit than by recovery. In those circumstances, the *in pari delicto* defense should be afforded. Cf. *A. C. Frost & Co.* v. *Coeur D'Alene Mines Corp.*, 312 U. S. 38, 43–44, and n. 2 (1941).

In *Bateman Eichler*, the Court granted certiorari to resolve a conflict of authority "over the proper scope of the *in pari delicto* defense in securities litigation." 472 U. S., at 305. The Court formulated the standards under which the defense should be recognized in language applicable generally to federal securities litigation. The formulation was articulated in the specific context of deciding when "a private action for damages [in implied causes of action under the fed-

---

[11] The Court of Appeals found that this conclusion was compelled by its decision in *Henderson* v. *Hayden, Stone Inc.*, 461 F. 2d 1069 (1972). See 787 F. 2d, at 987–988. That case, we note, does not discuss the *in pari delicto* defense. Accord, 794 F. 2d 1016, 1017 (1986) (opinion dissenting from denial of rehearing of the present case en banc).

eral securities laws] may be barred on the grounds of the plaintiff's own culpability." *Id.*, at 310. Nevertheless, the Court's rejection of the distinction between implied and express private causes of action, especially when considered in light of the broad question on which the Court granted certiorari, makes clear that the Court assumed that the *in pari delicto* defense should be equally available when Congress expressly provides for private remedies. Thus, we conclude that *Bateman Eichler* provides the appropriate test for allowance of the *in pari delicto* defense in a private action under any of the federal securities laws.

Our task, then, is to determine whether, pursuant to this test, recognition of the defense is proper in a suit for rescission brought under § 12(1) of the Securities Act. All parties in this case, as well as the Commission, maintain that the defense should be available.[12] We agree, but find it necessary to circumscribe the scope of its application.

### B

Under the first prong of the *Bateman Eichler* test, as we have noted above, a defendant cannot escape liability unless, as a direct result of the plaintiff's own actions, the plaintiff bears at least substantially equal responsibility for the under-

---

[12] Among the Courts of Appeals that have addressed the issue, the Fifth Circuit is alone in concluding that the defense is unavailable. The defense, however, rarely has succeeded on the facts of any particular case. See, *e. g.*, *Lawler* v. *Gilliam*, 569 F. 2d 1283, 1294 (CA4 1978); *Woolf* v. *S. D. Cohn & Co.*, 515 F. 2d 591, 604 (CA5 1975), vacated and remanded on other grounds, 426 U. S. 944 (1976); *Malamphy* v. *Real-Tex Enterprises, Inc.*, 527 F. 2d 978 (CA4 1975); *Katz* v. *Amos Treat & Co.*, 411 F. 2d 1046, 1054 (CA2 1969); *Can-Am Petroleum Co.* v. *Beck*, 331 F. 2d 371, 373–374 (CA10 1964). Commentators also have suggested that the defense should be available under proper circumstances in actions under § 12(1). See, *e. g.*, Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, *In Pari Delicto*, Indemnification, and Contribution, 120 U. Pa. L. Rev. 597, 662–663 (1971–1972); Note, In Pari Delicto Under the Federal Securities Laws: *Bateman Eichler, Hill Richards, Inc.* v. *Berner*, 72 Cornell L. Rev. 345, 359–362 (1987).

lying illegality. The plaintiff must be an active, voluntary participant in the unlawful activity that is the subject of the suit. See *Woolf* v. *S. D. Cohn & Co.*, 515 F. 2d 591, 604 (CA5 1975), vacated and remanded on other grounds, 426 U. S. 944 (1976); see also *Bateman Eichler*, 472 U. S., at 312. "Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." *Perma Life*, 392 U. S., at 153 (Harlan, J., concurring in part and dissenting in part). Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated. See *id.*, at 146 (WHITE, J., concurring); *id.*, at 147 (Fortas, J., concurring in result); *id.*, at 149 (MARSHALL, J., concurring in result); *Bateman Eichler*, 472 U. S., at 312–314. Refusal of relief to those less blameworthy would frustrate the purpose of the securities laws; it would not serve to discourage the actions of those most responsible for organizing forbidden schemes; and it would sacrifice protection of the general investing public in pursuit of individual punishment. See *Can-Am Petroleum Co.* v. *Beck*, 331 F. 2d 371, 373 (CA10 1964).

In the context of a private action under § 12(1), the first prong of the *Bateman Eichler* test is satisfied if the plaintiff is at least equally responsible for the actions that render the sale of the unregistered securities illegal—the issuer's failure to register the securities before offering them for sale, or his failure to conduct the sale in such a manner as to meet the registration exemption provisions. As the parties and the Commission agree, a purchaser's knowledge that the securities are unregistered cannot, by itself, constitute equal culpability, even where the investor is a sophisticated buyer who may not necessarily need the protection of the Securities Act. Barring the investor's recovery under the *in pari delicto* doctrine, "at least on the basis solely of the buyer's knowledge of the violation, is so foreign to the purpose of the section that there is hardly a trace of it in the decisions under

. . . § 12(1)." 3 L. Loss, Securities Regulation 1694 (2d ed. 1961).[13] Although a court's assessment of the relative respon-

sibility of the plaintiff will necessarily vary depending on the facts of the particular case, courts frequently have focused on the extent to which the plaintiff and the defendant cooperated in developing and carrying out the scheme to distribute unregistered securities. See, *e. g., Katz* v. *Amos Treat & Co.*, 411 F. 2d 1046, 1054 (CA2 1969); *Lawler* v. *Gilliam*, 569 F. 2d 1283, 1292–1293 (CA4 1978); *Malamphy* v. *Real-Tex Enterprises, Inc.*, 527 F. 2d 978 (CA4 1975). In addition, if the plaintiff were found to have induced the issuer not to register, he well might be precluded from obtaining § 12(1) rescission.

Under the second prong of the *Bateman Eichler* test, a plaintiff's recovery may be barred only if preclusion of suit

---

[13] The panel dissent below expressed concern that failure to provide the *in pari delicto* defense in these circumstances would allow sophisticated investors who purchase unregistered securities to place themselves in a no-lose situation. If the venture proves profitable, the buyer comes out ahead. If the investment goes bad, the buyer can sue to recover his investment in a § 12(1) action. See 787 F. 2d, at 995. The statute, however, permits such maneuvers. See Shulman, Civil Liability and the Securities Act, 43 Yale L. J. 227, 246–247 (1933) (Shulman); accord, L. Loss, Fundamentals of Securities Regulation 1003, n. 74 (2d ed. 1988) (Loss). Section 12(1)'s deterrent effect is achieved, to a great extent, by a provision allowing suits for a full year following sale. See 15 U. S. C. § 77m. Thus, the purchaser of unregistered securities may keep his securities and reap his profit if the securities perform well during the year, but rescind the sale if they do not. See, *e. g., Straley* v. *Universal Uranium & Milling Corp.*, 289 F. 2d 370 (CA9 1961). Although this provision may appear to offend a sense of fair play, allowing the investor to sue, regardless of his knowledge of the violation when he purchased the securities, furthers the interest of the Securities Act: the seller then has strong incentive to comply with the registration disclosure provisions. These provisions are concerned with affording the unsophisticated investor information necessary to make a knowledgeable investment decision. Permitting the sophisticated investor to recover also serves to protect the unknowing and innocent investor.

does not offend the underlying statutory policies. The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce. *SEC* v. *Ralston Purina Co.*, 346 U. S. 119, 124 (1953); *A. C. Frost & Co.* v. *Coeur D'Alene Mines Corp.*, 312 U. S., at 43, and n. 2. See H. R. Rep. No. 85, 73d Cong., 1st Sess., 1–5 (1933).[14] The registration requirements are the heart of the Act, and § 12(1) imposes strict liability for violating those requirements. Liability under § 12(1) is a particularly important enforcement tool, because in many instances a private suit is the only effective means of detecting and deterring a seller's wrongful failure to register securities before offering them for sale. *Lawler* v. *Gilliam*, 569 F. 2d, at 1293, citing *Woolf* v. *S. D. Cohn & Co.*, 515 F. 2d, at 605. See also *Bateman Eichler*, 472 U. S., at 310.

In our view, where the § 12(1) plaintiff is primarily an investor, precluding suit would interfere significantly with effective enforcement of the securities laws and frustrate the primary objective of the Securities Act. The Commission, too, takes this position. Because the Act is specifically designed to protect investors, even where a plaintiff actively participates in the distribution of unregistered securities, his

---

[14] Courts have discerned beneath the registration provisions the same broad policies as those furthered by the securities laws generally: protection of investors as a group, not as individuals, and the need for a healthy economy constantly purged by full disclosure. See, *e. g., SEC* v. *North American Research & Development Corp.*, 280 F. Supp. 106, 121 (SDNY 1968) (purpose of § 5 is to protect public investors through disclosure), aff'd in part and vacated in part on other grounds, 424 F. 2d 63 (CA2 1970). See generally, 1 Loss, Securities Regulation 178–179 (2d ed. 1961) (aim of registration provision is " 'to protect honest enterprise . . . ; to restore the confidence of the prospective investor . . . ; to bring into productive channels of industry and development capital which has grown timid . . . ; and to aid in providing employment and restoring buying and consumer power' "), quoting S. Rep. No. 47, 73d Cong., 1st Sess., 1 (1933).

suit should not be barred where his promotional efforts are incidental to his role as an investor.    See *Can-Am Petroleum Co.* v. *Beck*, 331 F. 2d, at 373–374 (plaintiff's "relationship as a pure investor became adulterated when she actively assisted in selling others but she at no time had the degree of culpability attributed to defendants and should not be considered as *in pari delicto*").    Cf. *Athas* v. *Day*, 186 F. Supp. 385, 389 (Colo. 1960) (barring recovery to plaintiff who participated extensively as promoter of unlawful securities distribution).    Thus, the *in pari delicto* defense may defeat recovery in a § 12(1) action only where the plaintiff's role in the offering or sale of nonexempted, unregistered securities is more as a promoter than as an investor.

Whether the plaintiff in a particular case is primarily an investor or primarily a promoter depends upon a host of factors, all readily accessible to trial courts.    These factors include the extent of the plaintiff's financial involvement compared to that of third parties solicited by the plaintiff, compare *Can-Am Petroleum Co.* v. *Beck, supra,* with *Athas* v. *Day, supra;* the incidental nature of the plaintiff's promotional activities, see *Malamphy* v. *Real-Tex Enterprises, Inc.*, 527 F. 2d, at 980; the benefits received by the plaintiff from his promotional activities; and the extent of the plaintiff's involvement in the planning stages of the offering (such as whether the plaintiff has arranged an underwriting or prepared the offering materials).    We do not mean to suggest that these factors provide conclusive evidence of culpable promotional activity, or that they constitute an exhaustive list of factors to be considered.    The courts are free, in the exercise of their sound discretion, to consider whatever facts are relevant to the inquiry.

## C

Given the record in this case, we cannot ascertain whether Pinter may successfully assert an *in pari delicto* defense

against Dahl's § 12(1) claim.[15]   The District Court's findings in this case are not adequate to determine whether Dahl bears at least substantially equal responsibility for the failure to register the oil and gas interests or to distribute the securities in a manner that conformed with the statutory exemption, and whether he was primarily a promoter of the offering.[16]   The findings indicate, on the one hand, that Dahl may have participated in initiating the entire investment, and that he loaned money to Pinter and solicited his associates' participation in the venture, but, on the other hand, that Dahl invested substantially more money than the other investor-respondents, expected and received no commission

---

[15] The parties vigorously dispute whether Pinter has a valid defense under the in pari delicto doctrine.   Pinter argues that Dahl was a "preeminent factor in the violations he seeks to redress."   Brief for Petitioners 29. He maintains that the venture would not have been undertaken or, at least, completed, had it not been for Dahl's involvement.   According to Pinter, Dahl's responsibility for causing the unlawful sales was at least substantially equal to his own.   Nevertheless, Pinter concedes that nothing in the record indicates whether Dahl was a participant in the decision not to register the securities, although Pinter would infer that Dahl was aware of the duty to register.   See id., at 27.

Dahl contends that his actions were not of equal fault to those of Pinter. He suggests that Pinter, as the issuer of the securities, was entirely responsible for the failure to register and to fulfill the requirements of Rule 146, although he points to no evidence in the record to support either position.   Dahl further argues, in a conclusory fashion, that he was not a promoter of any of the securities in which his co-respondents invested.   Finally, he asserts that he should be permitted to recover because "Pinter made the first step in the dissemination of unregistered securities and he will be more responsive to the deterrent pressure of potential sanctions." Brief for Respondents 98.

[16] In dictum, the Court of Appeals ventured that even if it were to apply the Bateman Eichler standard, Pinter would not be permitted to advance an in pari delicto defense against Dahl's recovery.   787 F. 2d, at 989, n. 6. Because the court did not have our delineation today of the proper inquiry regarding § 12(1) actions, and because we conclude that the District Court's findings were insufficient to conduct this analysis, the Court of Appeals' views on this point are not conclusive of the issue.

for his endeavors, and drafted none of the offering documents. Furthermore, the District Court made no findings as to who was responsible for the failure to register or for the manner in which the offering was conducted. Those findings will be made on the remand of this case for further proceedings.

## III

What we have said as to the availability to Pinter of the *in pari delicto* defense against Dahl's § 12(1) action does not obviate the need to consider the second question presented by petitioners.[17] We turn now to that issue.

In determining whether Dahl may be deemed a "seller" for purposes of § 12(1), such that he may be held liable for the sale of unregistered securities to the other investor-respondents, we look first at the language of § 12(1). See *Ernst & Ernst v. Hochfelder*, 425 U. S. 185, 197 (1976). That statute provides, in pertinent part: "Any person who . . . offers or sells a security" in violation of the registration requirement of the Securities Act "shall be liable to the person purchasing such security from him." 15 U. S. C. § 77*l*. This provision defines the class of defendants who may be subject to liability[18] as those who offer or sell unregistered

---

[17] Even if the Court of Appeals were ultimately to conclude that Dahl's actions bar his recovery against Pinter pursuant to the *in pari delicto* doctrine, that conclusion would not resolve the issue whether, based on Dahl's actions as a "seller" under § 12(1), Dahl might be held liable for contribution as to the remaining investor-respondents' claims against Pinter. We therefore are constrained to address, as did the Court of Appeals, whether Dahl is a "seller" for purposes of § 12(1).

[18] Section 12 was adapted from common-law (or equitable) rescission, Loss, at 888, which provided for restoration of the status quo by requiring the buyer to return what he received from the seller. The statute, however, differs significantly from the source material. In particular, it permits the buyer who has disposed of the security to sue for damages—"the consideration paid for such security with interest thereon, less the amount of any income received thereon." 15 U. S. C. § 77*l*. This damages calculation results in what is the substantial equivalent of rescission. See

securities.[19]   But the Securities Act nowhere delineates who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue.   The courts, on their part, have not defined the term uniformly.

At the very least, however, the language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity.   Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value.   See Loss, at 1016.   Dahl, of course, was not a seller in this conventional sense, and therefore may be held liable only if § 12(1) liability extends to persons other than the person who passes title.[20]

## A

In common parlance, a person may offer or sell property without necessarily being the person who transfers title to,

_Randall_ v. _Loftsgaarden,_ 478 U. S. 647, 655–656 (1986); Loss, at 886; Shulman, 43 Yale L. J., at 244.

[19] In addition, § 15 of the Securities Act, 15 U. S. C. § 77_o_, makes a "controlling person" liable for the § 12 liability of a controlled person.   That provision is not at issue in this case.

[20] The "offers or sells" and the "purchasing such security from him" language that governs § 12(1) also governs § 12(2), which provides a securities purchaser with a similar rescissionary cause of action for misrepresentation.   See 15 U. S. C. § 77_l_.   Most courts and commentators have not defined the defendant class differently for purposes of the two provisions. See, _e. g., Pharo_ v. _Smith,_ 621 F. 2d 656, 665–668, and nn. 6–8 (CA5 1980); Schneider, Section 12 of the Securities Act of 1933: The Privity Requirement in the Contemporary Securities Law Perspective, 51 Tenn. L. Rev. 235, 261, and nn. 144 and 145 (1983–1984).   See also _Schillner_ v. _H. Vaughan Clarke & Co.,_ 134 F. 2d 875, 878 (CA2 1943) ("Clearly the word [sell] has the same meaning in subdivision (2) as in subdivision (1) of section 12").

The question whether anyone beyond the transferor of title, or immediate vendor, may be deemed a seller for purposes of § 12 has been litigated in actions under both § 12(1) and § 12(2).   Decisions under § 12(2) addressing the "seller" question are thus relevant to the issue presented to us in this case, and, to that extent, we discuss them here.   Nevertheless, this case does not present, nor do we take a position on, the scope of a statutory seller for purposes of § 12(2).

or other interest in, that property. We need not rely entirely on ordinary understanding of the statutory language, however, for the Securities Act defines the operative terms of § 12(1). Section 2(3) defines "sale" or "sell" to include "every contract of sale or disposition of a security or interest in a security, for value," and the terms "offer to sell," "offer for sale," or "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U. S. C. § 77b(3). Under these definitions, the range of persons potentially liable under § 12(1) is not limited to persons who pass title. The inclusion of the phrase "solicitation of an offer to buy" within the definition of "offer" brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12. See Loss, at 1016; Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L. J. 171, 206–207 (1933). Indeed, the Court has made clear, in the context of interpreting § 17(a) of the Securities Act, 15 U. S. C. § 77q(a), that transactions other than traditional sales of securities are within the scope of § 2(3) and passage of title is not important. See *United States* v. *Naftalin*, 441 U. S. 768, 773 (1979). We there explained: "The statutory terms ["offer" and "sell"], which Congress expressly intended to define broadly, . . . are expansive enough to encompass the entire selling process, including the seller/agent transaction." *Ibid.* See also *Rubin* v. *United States*, 449 U. S. 424, 430 (1981) ("It is not essential under the terms of the Act that full title pass to a transferee for the transaction to be an 'offer' or a 'sale'").

Determining that the activity in question falls within the definition of "offer" or "sell" in § 2(3), however, is only half of the analysis. The second clause of § 12(1), which provides that only a defendant "from" whom the plaintiff "purchased" securities may be liable, narrows the field of potential sell-

ers.[21]  Several courts and commentators have stated that the purchase requirement necessarily restricts § 12 primary liability to the owner of the security.  *E. g., Beck* v. *Cantor, Fitzgerald & Co.*, 621 F. Supp. 1547, 1560–1561 (ND Ill. 1985); Abrams, The Scope of Liability Under Section 12 of the Securities Act of 1933: "Participation" and the Pertinent Legislative Materials, 15 Ford. Urban L. J. 877 (1987); see also *Collins* v. *Signetics Corp.*, 605 F. 2d 110, 113 (CA3 1979) (absent some "special relationship"—*e. g.*, control—§ 12 requires privity between statutory seller and buyer).  In effect, these authorities interpret the term "purchase" as complementary to only the term "sell" defined in § 2(3).  Thus, an offeror, as defined by § 2(3), may incur § 12 liability only if the offeror also "sells" the security to the plaintiff, in the sense of transferring title for value.  Abrams, 15 Ford. Urban L. J., at 922–923.

We do not read § 12(1) so restrictively.  The purchase requirement clearly confines § 12 liability to those situations in which a sale has taken place.  Thus, a prospective buyer has no recourse against a person who touts unregistered securities to him if he does not purchase the securities.  Loss, at 884.  The requirement, however, does not exclude solicitation from the category of activities that may render a person liable when a sale has taken place.  A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase.  For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title.  See *Cady* v. *Murphy*, 113 F. 2d 988, 990 (CA1) (finding bro-

---

[21] One important consequence of this provision is that § 12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers.  Thus, a buyer cannot recover against his seller's seller.  Loss, at 1023–1024; Douglas & Bates, 43 Yale L. J., at 177.

ker acting as agent of the owner liable as a statutory seller), cert. denied, 311 U. S. 705 (1940).

The Securities Act does not define the term "purchase." The soundest interpretation of the term, however, is as a correlative to both "sell" and "offer," at least to the extent that the latter entails active solicitation of an offer to buy. This interpretation is supported by the history of the phrase "offers or sells," as it is used in § 12(1). As enacted in 1933, § 12(1) imposed liability on "[a]ny person who . . . sells a security." 48 Stat. 84. The statutory definition of "sell" included "offer" and the activities now encompassed by that term, including solicitation. *Id.*, at 74. The words "offer or" were added to § 12(1) by the 1954 amendments to the Securities Act, when the original definition of "sell" in § 2(3) was split into separate definitions of "sell" and "offer" in order to accommodate changes in § 5. 68 Stat. 683, 686. Since "sells" and "purchases" have obvious correlative meanings, Congress' express definition of "sells" in the original Securities Act to include solicitation suggests that the class of those from whom the buyer "purchases" extended to persons who solicit him. The 1954 amendment to § 12(1) was intended to preserve existing law, including the liability provisions of the Act. H. R. Rep. No. 1542, 83d Cong., 2d Sess., 26 (1954); S. Rep. No. 1036, 83d Cong., 2d Sess., 18 (1954); Loss, at 884. Hence, there is no reason to think Congress intended to narrow the meaning of "purchased from" when it amended the statute to include "solicitation" in the statutory definition of "offer" alone.[22]

---

[22] It is noteworthy that in 1940 Congress considered a proposal that would have excluded the solicitation clause from the definition of "sell" in § 2(3). See S. 3985, 76th Cong., 3d Sess., 1–2 (1940), as introduced, 86 Cong. Rec. 6026 (1940). This amendment clearly would have reduced the meaning of the term "sell" to transferring title for value and would have eliminated the potential for liability of brokers or other persons soliciting a sale of securities. The proposal was not adopted.

The applicability of § 12 liability to brokers and others who solicit securities purchases has been recognized frequently since the passage of the Securities Act.  It long has been "quite clear," that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller. See Loss, at 1016.  Indeed, courts had found liability on this basis prior to the 1954 amendment of the statute.  See, *e. g.*, *Wall* v. *Wagner*, 125 F. Supp. 854, 858 (Neb. 1954), aff'd *sub nom. Whittaker* v. *Wall*, 226 F. 2d 868, 873 (CA8 1955) (principal and its agents); *Schillner* v. *H. Vaughan Clarke & Co.*, 134 F. 2d 875, 879 (CA2 1943) (seller's broker); *Cady* v. *Murphy, supra* (seller's broker); *Boehm* v. *Granger*, 42 N. Y. S. 2d 246, 248 (Sup. 1943), aff'd, 268 App. Div. 855, 50 N. Y. S. 2d 845 (1944) (buyer's broker).  Had Congress intended liability to be restricted to those who pass title, it could have effectuated its intent by not adding the phrase "offers or" when it split the definition of "sell" in § 2(3).

An interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities.  In order to effectuate Congress' intent that § 12(1) civil liability be *in terrorem*, see Douglas & Bates, 43 Yale L. J., at 173; Shulman, 43 Yale L. J., at 227, the risk of its invocation should be felt by solicitors of purchases.  The solicitation of a buyer is perhaps the most critical stage of the selling transaction.  It is the first stage of a traditional securities sale to involve the buyer, and it is directed at producing the sale.  In addition, brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors.  Thus, solicitation is the stage at which an investor is most likely to be injured, that is, by

being persuaded to purchase securities without full and fair information. Given Congress' overriding goal of preventing this injury, we may infer that Congress intended solicitation to fall under the mantle of § 12(1).

Although we conclude that Congress intended § 12(1) liability to extend to those who solicit securities purchases, we share the Court of Appeals' conclusion that Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer. When a person who urges another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer "purchased" from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as "soliciting." Section 2(3) defines an offer as a "solicitation of an offer to buy . . . for value." The person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in· exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale. The language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him and to align him with the owner in a rescission action.[23]

---

[23] Those commentators who argue that § 12 confines seller status to the transferor maintain that the section's provision of rescissionary relief supports their conclusion. *E. g.*, Abrams, 15 Ford. Urban L. J., at 924. There is authority at common law, however, for granting a plaintiff rescission against a defendant who was not a party to the contract in question, in particular, against the agent of the vendor. See, *e. g.*, *Keskal* v. *Modrakowski*, 249 N. Y. 406, 408, 164 N. E. 333 (1928); *Peterson* v. *McManus*, 187 Iowa 522, 545–549, 172 N. W. 460, 468–470 (1919). Indeed, there is nothing incongruous about forcing a broker or other solicitor to assume ownership of the securities. When rescission is predicated on fraud, rather than based on contract theory, privity is not essential. Loss, at 1017, quoting *Gordon* v. *Burr*, 506 F. 2d 1080, 1085 (CA2 1974) ("[A]s

## B

Petitioner is not satisfied with extending § 12(1) primary liability to one who solicits securities sales for financial gain. Pinter assumes, without explication, that liability is not limited to the person who actually parts title with the securities, and urges us to validate, as the standard by which additional defendant-sellers are identified, that version of the "substantial factor" test utilized by the Fifth Circuit before the refinement espoused in this case.[24] Under that approach,

between the innocent purchaser and the wrongdoer who, though not a privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo"). In any event, there is no reason to think that Congress wanted to bind itself to the common-law notion of the circumstances in which rescission is an appropriate remedy. The Court, in the context of § 12(2), has noted that Congress enabled investors to demand rescission upon tender of the securities to the defendant, in part because of the additional measure of deterrence provided by rescission as compared to a purely compensatory measure of damages. *Randall* v. *Loftsgaarden*, 478 U. S., at 659. Thus, we may infer that Congress, in order to effectuate its goals, chose to impose this relief on any defendant it classified as a statutory seller, regardless of the fact that such imposition was somewhat inconsistent with the use of rescission at common law. Congress chose rescission for its effects; there is no indication that Congress employed the remedy for its delineation of potential defendants.

[24] The Fifth Circuit's test is only one of several approaches that have emerged in expanding § 12 liability beyond the security titleholder. See generally O'Hara, Erosion of the Privity Requirement in Section 12(2) of the Securities Act of 1933: The Expanded Meaning of Seller, 31 UCLA L. Rev. 921 (1983–1984); Rapp, Expanded Liability Under Section 12 of the Securities Act: When Is a Seller Not a Seller?, 27 Case W. Res. L. Rev. 445 (1977); Note, Seller Liability Under Section 12(2) of the Securities Act of 1933: A Proximate Cause-Substantial Factor Approach Limited by a Duty of Inquiry, 36 Vand. L. Rev. 361 (1983); Comment, Attorneys and Participant Liability Under § 12(2) of the Securities Act of 1933, 1982 Ariz. S. L. J. 529. All but one of these theories reflect the courts' views of who constitutes a § 12 seller. The remaining approach—the aiding and abetting theory—is actually a method by which courts create secondary liability in persons other than the statutory seller. See, *e. g., Mayer* v. *Oil Field Systems Corp.*, 803 F. 2d 749, 756 (CA2 1986); *In re Caesars Palace*

grounded in tort doctrine, a nontransferor § 12(1) seller is defined as one "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place." *Pharo* v. *Smith*, 621 F. 2d 656, 667 (CA5 1980).[25]

*Securities Litigation,* 360 F. Supp. 366 (SDNY 1973); see also *Collins* v. *Signetics Corp.*, 605. F. 2d 110, 113–114 (CA3 1979) (leaving open whether aiding and abetting liability is available). Because this case deals exclusively with primary liability under § 12(1), we need not consider whether civil liability for aiding and abetting is appropriate under that section. Compare Comment, 1982 Ariz. S. L. J., at 550–577 (endorsing aiding and abetting liability under § 12(2)); Ruder, 120 U. Pa. L. Rev., at 620–644 (same), with Abrams, 15 Ford. Urban L. J., at 942–947 (disapproving secondary liability under § 12); O'Hara, 31 UCLA L. Rev., at 979–1002 (arguing that any form of participant liability, whether primary or secondary, is inappropriate under § 12(2)).

[25] The substantial-factor test reflects a conviction that § 12 liability "must lie somewhere between the narrow view, which holds only the parties to the sale, and the too-liberal view which would hold all who remotely participated in the events leading up to the transaction." *Lennerth* v. *Mendenhall*, 234 F. Supp. 59, 65 (ND Ohio 1964). That court elected to "borrow a phrase from the law of negligence" and to premise liability on proximate cause. It imposed § 12(1) liability on the issuer that transferred title and the issuer's president, vice president, and another employee. The Fifth Circuit adopted the proximate cause rationale in *Hill York Corp.* v. *American International Franchises, Inc.*, 448 F. 2d 680, 693 (1971) (holding that promoters of a nationwide franchising scheme were § 12 sellers), and two years later refined the doctrine to impose liability on defendants whose actions were a " 'substantial factor' " in causing a plaintiff's purchases. See *Lewis* v. *Walston & Co.*, 487 F. 2d 617, 622 (CA5 1973) (affirming § 12(1) judgment against a brokerage firm and its representative who touted unregistered securities and arranged for their purchase by the plaintiff).

A number of courts have followed that view. See *Lawler* v. *Gilliam,* 569 F. 2d, at 1287–1288 (§ 12(1)); *Adalman* v. *Baker, Watts & Co.*, 807 F. 2d 359, 363 (CA4 1986) (§ 12(2)); *Davis* v. *Avco Financial Services, Inc.*, 739 F. 2d 1057, 1067 (CA6 1984) (§ 12(2)), cert. denied, 470 U. S. 1005 (1985); *Stokes* v. *Lokken,* 644 F. 2d 779, 785 (CA8 1981) (§ 12 generally); *Foster* v. *Jesup & Lamont Securities Co.*, 759 F. 2d 838, 843–844 (CA11 1985) (§ 12 generally).

The Ninth Circuit has shaped its own version of the test. See *Anderson* v. *Aurotek,* 774 F. 2d 927, 930 (1985) (imposing § 12 liability on " 'partici-

The Court of Appeals acknowledged that Dahl would be liable as a statutory seller under this test. 787 F. 2d, at 990.

We do not agree that Congress contemplated imposing § 12(1) liability under the broad terms petitioners advocate. There is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who "offer," including those who "solicit" offers. Indeed, § 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale. When Congress wished to create such liability, it had little trouble doing so. Cf. *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 572 (1979).[26]

---

pants' whose acts are 'both necessary to and a substantial factor in the sales transaction'"). See also *SEC* v. *Rogers*, 790 F. 2d 1450, 1456 (CA9 1986) (explaining that the "necessary" and "substantial factor" prongs require separate showings: "The first prong . . . requires a defendant's participation to be a 'but for' cause of the unlawful sale, and the second requires the participation to be more than 'de minimis'").

[26] Congress knew of the collateral participation concept and employed it in the Securities Act and throughout its unified program of securities regulation. Liabilities and obligations expressly grounded in participation are found elsewhere in the Act, see, *e. g.*, 15 U. S. C. § 77b(11) (defining "underwriter," who is liable under § 5, as including direct and indirect participants), and in the later Roosevelt administration securities Acts. For example, § 9 of the 1934 Act, passed by the same Congress that enacted the Securities Act, creates a private right of action that expressly imposes liability on participants. 15 U. S. C. § 78i(e). See Abrams, 15 Ford. Urban L. J., at 925–937.

Section 11 of the Securities Act, 15 U. S. C. § 77k, lends strong support to the conclusion that Congress did not intend to extend § 12 primary liability to collateral participants in the unlawful securities sales transaction. That section provides an express cause of action for damages to a person acquiring securities pursuant to a registration statement that misstates or omits a material fact. Section 11(a) explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in § 12, and

The deficiency of the substantial-factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme. Those courts that have adopted the approach have not attempted to ground their analysis in the statutory language. See n. 25, *supra.* Instead, they substitute the concept of substantial participation in the sales transaction, or proximate causation of the plaintiff's purchase, for the words "offers or sells" in § 12. The "purchase from" requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser. The substantial-factor test, on the other hand, focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances. Thus, although the substantial-factor test undoubtedly embraces persons who pass title and who solicit the purchase of unregistered securities as statutory sellers, the test also would extend § 12(1) liability to participants only remotely related to the relevant aspects of the sales transaction. Indeed, it might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.[27]

---

therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions.

[27] For similar reasons, we reject the Commission's suggestion that persons who "participate in soliciting the purchase" may be liable as statutory sellers. Brief for SEC as *Amicus Curiae* 22. The Commission relies on *Katz* v. *Amos Treat & Co.*, 411 F. 2d 1046 (CA2 1969), where the court held that an attorney who had been "a party to the solicitation" of the plaintiff-purchaser was liable under § 12(1) because he had placed the brokerage firm for which he worked in a position "to tackle [the purchaser] for the money" owed on an investment he had made. *Id.*, at 1053. Although in *Katz* the attorney spoke directly to the plaintiff prior to the delivery of money in plaintiff's investment, the "party to a solicitation" concept could easily embrace those who merely assist in another's solicitation

Further, no congressional intent to incorporate tort law doctrines of reliance and causation into § 12(1) emerges from the language or the legislative history of the statute. Indeed, the strict liability nature of the statutory cause of action suggests the opposite. See Douglas & Bates, 43 Yale L. J., at 177. By injecting these concepts into § 12(1) litigation, the substantial-factor test introduces an element of uncertainty into an area that demands certainty and predictability. As the Fifth Circuit has conceded, the test affords no guidelines for distinguishing between the defendant whose conduct rises to a level of significance sufficient to trigger seller status, and the defendant whose conduct is not sufficiently integral to the sale. See *Pharo* v. *Smith*, 621 F. 2d, at 667.[28] None of the courts employing the approach has articulated what measure of participation qualifies a person for seller status, and logically sound limitations would be difficult to develop. As a result, decisions are made on an ad hoc basis, offering little predictive value to participants in securities transactions. See *Croy* v. *Campbell*, 624 F. 2d 709, 714 (CA5 1980); *Pharo* v. *Smith*, 621 F. 2d, at 667. We find it particularly unlikely that Congress would have ordained *sub silentio* the imposition of strict liability on such an unpredictably defined class of defendants.

Not surprisingly, Pinter makes no attempt to justify the substantial-factor test as a matter of statutory construction. Instead, the sole justification Pinter advances is that extend-

---

efforts. See Schneider, 51 Tenn. L. Rev., at 273 (suggesting that the *Katz* approach allows courts to interpret solicitation activities "rather broadly"). It is difficult to see more than a slight difference between this approach and the participation theory, which we have concluded does not comport with Congress' intent.

[28] Even in the tort law context, the substantial-factor test is recognized as inadequate for determining whether the defendant's conduct was so significant and important a cause that the law should extend responsibility for the conduct to the consequences that occurred. See W. Prosser, Law of Torts § 42, pp. 244, 248 (4th ed. 1971).

ing § 12 liability pursuant to the test protects investors and serves the "remedial purposes" of the Securities Act. See also, *e. g., Lennerth* v. *Mendenhall,* 234 F. Supp. 59, 65 (ND Ohio 1964). The Court has acknowledged that "it is proper for a court to consider . . . policy considerations in construing terms in [the federal securities] Acts." *Landreth Timber Co.* v. *Landreth,* 471 U. S. 681, 695, n. 7 (1985). And the Court has recognized that Congress had "broad remedial goals" in enacting the securities laws and providing civil reme-dies. *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 200; *Tcherepnin* v. *Knight,* 389 U. S. 332, 336 (1967). Accordingly, the Court itself has construed securities law provisions "'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.'" *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972), quoting *SEC* v. *Capital Gains Research Bureau, Inc.,* 375 U. S. 180, 195 (1963). But the Court never has conducted its analysis entirely apart from the statutory language. "The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." *Touche Ross & Co.* v. *Redington,* 442 U. S., at 578. The ascertainment of congressional intent with respect to the scope of liability created by a particular section of the Securities Act must rest primarily on the language of that section. See *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 472 (1977). The broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision "'more broadly than its language and the statutory scheme reasonably permit.'" *Touche Ross,* 442 U. S., at 578, quoting *SEC* v. *Sloan,* 436 U. S. 103, 116 (1978). We must assume that Congress meant what it said.

The substantial-factor test reaches participants in sales transactions who do not even arguably fit within the definitions set out in § 2(3); it "would add a gloss to the operative language of [§ 12(1)] quite different from its commonly ac-

cepted meaning." *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 199. We conclude that Congress did not intend such a gross departure from the statutory language. Accordingly, we need not entertain Pinter's policy arguments.[29] Being merely a "substantial factor" in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under § 12(1).

### C

We are unable to determine whether Dahl may be held liable as a statutory seller under § 12(1). The District Court explicitly found that "Dahl solicited each of the other plaintiffs (save perhaps Grantham) in connection with the offer, purchase, and receipt of their oil and gas interests." App. to Pet. for Cert. a–34. We cannot conclude that this finding was clearly erroneous. It is not clear, however, that Dahl had the kind of interest in the sales that make him liable as a statutory seller. We do know that he received no commission from Pinter in connection with the other sales, but this is not conclusive. Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as where he "anticipat[es] a share of the profits," *Lawler* v. *Gilliam,* 569 F. 2d, at 1288, or receives a brokerage commission, *Cady* v. *Murphy,* 113 F. 2d, at 990. But

---

[29] We observe, however, that although every rule that extends liability serves on some level to protect investors, the substantial-factor test does not necessarily further the remedial purposes of § 12(1). Imposing a strict liability rescission remedy on those who are only tangentially involved with the sale might result in less and poorer information to investors, rather than more and better information. Because strict liability is involved, once a person became involved in the transaction, even peripherally, it would be impossible to avoid the risk of liability. There is little danger that this risk will deter true sellers from giving information, for they have no other way to go about their business. They also have the most control over conducting the sale in a manner that avoids liability. For those more attenuated to the sales transaction, however, who have far less, if any, control over the transaction, the harshness of § 12(1) might deter them from assisting. Particularly since the test produces unpredictable results, it risks over-deterring activities related to lawful securities sales.

a person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under § 12(1) without showing that he expects to participate in the benefits the owner enjoys.

The Court of Appeals apparently concluded that Dahl was motivated entirely by a gratuitous desire to share an attractive investment opportunity with his friends and associates. See 787 F. 2d, at 991. This conclusion, in our view, was premature. The District Court made no findings that focused on whether Dahl urged the other purchases in order to further some financial interest of his own or of Pinter. Accordingly, further findings are necessary to assess Dahl's liability.[30]

## IV

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE STEVENS, dissenting.

Although I substantially agree with the Court's discussion of the *in pari delicto* defense in Parts II–A and II–B of its opinion, I disagree with its application of that discussion to the facts of this case.[1] Moreover, I am unable to join Part

---

[30] Of course, on remand the Court of Appeals may find it necessary to address some of the difficult and unsettled questions raised by the dissent concerning the availability of contribution in § 12(1) cases in general and in this case in particular.

[1] The Court holds that "[i]n the context of a private action under § 12(1), the first prong of the *[in pari delicto]* test is satisfied if the plaintiff is at least equally responsible for the actions that render the sale of the unregistered securities illegal—the issuer's failure to register the securities before offering them for sale, or his failure to conduct the sale in such a manner as to meet the registration exemption provisions." *Ante,* at 636. I agree that a plaintiff who is at least equally responsible for "the issuer's failure to register the securities before offering them for sale" can be held

III because I am persuaded that the discussion of the § 12(1) term "seller" in the context of a contribution suit is both advisory, because no such suit was brought in this case, and misleading, because it assumes that the class of persons who sell securities to purchasers (*i. e.*, § 12(1) "sellers") is coextensive with the class of potential defendants in claims for contribution, not brought directly under § 12(1), asserted by § 12(1) sellers. § 12(1), Securities Act of 1933, 15 U. S. C. § 77*l*(1).

## I

In this case, Pinter had the burden of proving that Dahl shared at least equal responsibility for the action that resulted in the § 12(1) violation, *i. e.*, the failure to register the securities. But, as the Court notes, Pinter has conceded that "nothing in the record indicates whether Dahl was a participant in the decision not to register the securities." *Ante,* at 640, n. 15; see Brief for Petitioners 27. Further, the Court of Appeals concluded, and it is undisputed here, that there is no evidence that Dahl knew that the failure to register the securities was unlawful.[2]

---

*in pari delicto.* I am perplexed, though, by the Court's conclusion that a plaintiff who is at least equally responsible for "the issuer's failure to conduct the sale in such a manner as to meet the registration exemption provision" can be held *in pari delicto*. Such a failure is of course never a sufficient condition for § 12(1) strict liability; regardless of how many exemptions for which an offering fails to qualify, § 12(1) is not violated unless the securities in question are offered or sold without registration. Thus, it is hard for me to understand how a plaintiff who bears substantially equal responsibility for the loss of an exemption but who does not bear similar responsibility for the proximate cause of the illegality—the failure to register—can be considered *in pari delicto*. Part I, *infra*, reflects my view of how the *in pari delicto* issue in this case should be resolved under what I deem to be the proper view of the defense.

[2] "There is no evidence, however, that Dahl knew that Pinter's failure to register was in violation of federal and state securities laws." 787 F. 2d 985, 987 (CA5 1986).

Pinter's "infer[ence] that Dahl was aware of the duty to register," *ante*, at 640, n. 15; see Brief for Petitioners 27, is thus directly contradicted by the Court of Appeals' conclusion.

Because "the District Court made no findings as to who was responsible for the failure to register or for the manner in which the offering was conducted," *ante*, at 641, the majority concludes that we must remand for further findings. It seems to me, though, that the District Court's failure to make findings on the critical issue of responsibility for failure to register is properly attributed to Pinter's failure to direct the court's attention to the issue. Pinter pleaded his *in pari delicto* defense as follows:

> "The Plaintiff, M. Dahl, engaged in fraudulent misrepresentations to Pinter and the other Plaintiffs, all as set forth in the Defendant's Counterclaim. He is therefore barred from recovery for the causes of action set forth in [Plaintiffs' First Amended Complaint], by reason of his conduct *in pari delicto* in connection with the offer, sale and delivery of the securities of that which he complains." App. 67.

In light of the fact that the District Court expressly found that the "evidence did not establish that defendants are entitled to any relief on their counterclaims," App. to Pet. for Cert. a–38, it would seem to follow that the District Court also found that there was no factual basis for the *in pari delicto* affirmative defense as pleaded.

Pinter did, though, in his proposed findings of fact and conclusions of law, set forth a somewhat different theory for the *in pari delicto* defense. He proposed as a conclusion of law that "[a]s a result of his participation in the solicitation of the investment by other Plaintiffs in the subject lease transactions, Dahl is in pari delicto and cannot recover in this action as a matter of law." 2 Record 274. Thus, if one construes this proposal liberally as amending the pleading, it is fair to conclude that the District Court was at least directed to examine the nature of Dahl's participation in the solicitation of others to invest in the Pinter leases. But nowhere in his proposed findings of fact or conclusions of law did Pinter suggest that Dahl played any role in the failure to register the

securities. To be sure, in arguing that the private offering exemption should apply, Pinter asked the court to find that Dahl "received or collected most of the investment proceeds from [the other investors] and hand delivered the funds to Pinter. He had disclosure of or access to all of the information requisite to a registration statement." *Id.*, at 395. But all of this was proposed to convince the court that the private offering exemption applied, and, more importantly, none of it suggests that Dahl aided Pinter in any way in the latter's decision not to (or failure to) register the securities. Thus, by permitting Pinter to argue now, on remand, for the first time, that Dahl played a role in the failure to register, the majority gives Pinter a second chance to litigate an issue that he was in no way prevented from litigating the first time before the District Court. Since there is nothing in the record to suggest that the District Court committed any error of law in rejecting the *in pari delicto* defense, the fact that the Court of Appeals may have entertained a different legal view of the defense than we do is not a sufficient reason for giving Pinter another opportunity to prove facts that he failed to establish at trial.[3]

## II

The question concerning Pinter's possible right to contribution from Dahl relates only to the proceeds of the sales to the

---

[3] Indeed, the Court of Appeals may find that Texas law requires a re-entry of its judgment. The District Court found that Pinter had violated not only § 12(1) of the Securities Act of 1933, but also Tex. Rev. Civ. Stat. Ann., Art. 581–33(A), (D) (Vernon Supp. 1988), and that the same remedy was authorized by both statutes. See App. to Pet. for Cert. a–37—a–38. The Court of Appeals affirmed the finding of liability under Texas law, and also squarely held that Dahl was not a "seller" within the meaning of the Texas statute. See 787 F. 2d, at 991. It is true that the Court of Appeals did not reach the question whether an *in pari delicto* defense might be available under Texas law. *Id.*, at 990. If it should conclude, however, that Texas would not recognize that defense on the facts of this case, its judgment should stand regardless of the outcome of any further proceedings concerning the federal issues.

plaintiffs other than Dahl who elected to sue Pinter and not Dahl. Initially, it is unclear how this matter is properly before us. The Court acknowledges that "Pinter's pleadings do not state an explicit cause of action for contribution against Dahl," see *ante*, at 630, n. 9, and suggests that "the Court of Appeals construed Pinter's affirmative defense for contributory fault and his incorporation of this defense into his counterclaims, as effectively seeking contribution." *Ibid.* If this were so then the matter is easily resolvable, for as I have pointed out *supra*, at 657, the District Court expressly found that the "evidence did not establish that defendants are entitled to any relief on their counterclaims," and there is nothing in the record indicating (nor any assertion here) that the District Court applied an erroneous legal standard in rejecting the counterclaims. In any event, Pinter in fact brought no claim for contribution, and the fact that the Court of Appeals saw fit to discuss whether Dahl could be held liable in such a hypothetical lawsuit does not, in my opinion, justify the issuance of an advisory opinion by this Court.[4]

Even if there is a right to contribution in cases like this,[5] and even if Pinter had alleged a claim for contribution against

---

[4] Thus, the Court of Appeals on remand may have no choice but to affirm the District Court's judgment once again, this time on the ground that no contribution claim is properly before it.

[5] The Court "express[es] no view as to whether a right of contribution exists under § 12(1) of the Securities Act." *Ante*, at 630, n. 9. The Court of Appeals pointed out that "no code section specifically allows for a right of contribution against a 'seller' in Dahl's position." 787 F. 2d, at 990, n. 8. Such a right might be found, the court stated, in § 16 of the Act, 15 U. S. C. § 77p, which provides that "[t]he rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." Whether the availability of such additional rights and remedies depends upon the satisfaction of conditions set forth elsewhere in the Act—such as § 12(1)—is surely an open question.

I note also that this Court has been reluctant to imply a right to contribution in statutes silent on the issue. Compare *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630 (1981) (no right to contribution under the federal antitrust laws); *Northwest Airlines, Inc.* v. *Transport*

Dahl, I see no reason for assuming that the merits of such a claim would be governed by the definition of the term "seller" as used in § 12(1). For even if Dahl might be regarded as a seller in an action brought by the other purchasers of unregistered securities, Pinter would have a right to contribution against Dahl only if Dahl had received some of the proceeds of sale for which Pinter had been held accountable. Moreover, the contours of the right to contribution may be such that if Dahl had shared in those proceeds knowing that they had been obtained in violation of law, he might have to return his share even if he was not technically a "seller" of any securities. For it is by no means clear that the class of persons who may be held liable for contribution to those held primarily liable in § 12(1) rescission actions should be limited to those who "successfully solici[t] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Ante,* at 647. Thus, the Court's discussion of the "seller" issue is neither sufficient nor necessary for the resolution of Pinter's putative contribution claim.

It would be necessary, however, in resolving a contribution claim such as this, to determine whether the defendant had to account for any proceeds that were actually held by the third-party (contribution) defendant. For § 12(1) is an action for rescission. The statute expressly provides that the purchaser of an unregistered security may "recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of

*Workers,* 451 U. S. 77 (1981) (no right to contribution by employer against union for violations of either the Equal Pay Act of 1963 or Title VII of the Civil Rights Act of 1964); and *Halcyon Lines* v. *Haenn Ship Ceiling & Refitting Corp.,* 342 U. S. 282, 285 (1952) (Court refuses to fashion right to maritime contribution in noncollision cases, concluding that "the solution of this problem should await congressional action"); with *United States* v. *Yellow Cab Co.,* 340 U. S. 543 (1951) (Congress waived sovereign immunity in the Federal Tort Claims Act for contribution claims against the United States).

such security. . . ." 15 U. S. C. § 77*l*(1). The judgment entered by the District Court tracked the language of the statute. After reciting that the plaintiffs had made a tender of the securities purchased from Pinter, it ordered that each of them "have judgment against B. J. Pinter, individually and d/b/a/ Black Gold Oil Company, in the amount of their purchase price for the securities purchased, plus prejudgment interest thereon at the rate of 6% annum from the date of payment of their purchase price in May, 1981, less the amount of any income a Plaintiff received on the security. . . ." App. 92.

The District Court found that all of the unregistered securities were "offered, sold and delivered" by the defendant Pinter "individually and d/b/a/ Black Gold Oil Company," App. to Pet. for Cert. a–32, and it is undisputed that all of the proceeds of sale were received by Pinter. Specifically, the District Court found:

> "Dahl did not receive from defendants any commission, by way of discount or otherwise, in connection with the purchase by any plaintiff of the fractional undivided oil and gas interests involved in this suit." *Id.*, at a–34.

Given the undisputed facts, the statutory remedy of rescission[6] was complete when the securities were returned in exchange for the purchase price plus interest. Even if there may be a basis for a right to contribution in cases in which one seller has shared the proceeds of sale with another and has been held liable for those proceeds, it seems obvious to me that the scheme of the statute would be frustrated by allowing a seller to recover from a third party who did not receive any part of the purchase price.[7] The Court of Appeals

---

[6] It should be noted that the statutory remedy for damages is not applicable in this case because that remedy is only available if the purchaser "no longer owns the security." 15 U. S. C. § 77*l*(1).

[7] Another way of putting this is that a defendant in a rescission suit cannot claim contribution when he received the entire proceeds of sale and merely returned those proceeds to the plaintiff in exchange for the plain-

expressly recognized this independent basis for affirmance when it stated:

> "In light of the clear purpose of section 12(1) to disgorge the purchase price from the seller of unregistered securities, we view as unsound any result which would permit Pinter to retain part of the consideration paid by plaintiffs."  787 F. 2d 985, 990, n. 8 (CA5 1986).

In my opinion, this is a sufficient reason for affirming the judgment of the Court of Appeals.

---

tiff's tender of the purchased item (here, the securities).  See *Olson* v. *Thompson*, 273 Minn. 152, 154–155, 140 N. W. 2d 321, 322 (1966) ("While the action is one sounding in tort, the relief sought is for rescission, requiring restitution of the purchase price and a reassignment of the leases.  In his third-party action Thompson makes no demand for damages, and the theory on which he claims contribution is not clear, since the parties by the nature of the action are merely restored to the status quo ante").  Thus, it is a basic principle of equity jurisprudence that a claim for contribution only lies for a defendant who "has actually paid or satisfied more than his proportionate share of the debt or obligation."  4 S. Symons, Pomeroy's Equity Jurisprudence 1071–1072 (5th ed. 1941); see also Restatement (Second) of Torts § 886A(2) (1979) ("The right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability; and is limited to the amount paid by him in excess of his share.  No tortfeasor can be required to make contribution beyond his own equitable share of the liability").