**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 5 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

MED SAFE NORTHWEST, INC., a Washington
corporation; EDWARD G. MIFSUD; JANINE
MIFSUD; PAUL MAHONEY; CHARLES
LANGLAIS; MADDISON WON; RICHARD
DON; CHRIS STARK; DONALD VAN HOOK;
KIM VAN HOOK; MED SAFE ATLANTIC,
INC., a North Carolina corporation; RICHARD
DRISCOLL,

       Plaintiffs,

JOHN KOCKOS, KENT KOCKOS, SCOTT
KOCKOS,

       Plaintiffs-Appellants,
v.

MEDVIAL, INC., f/k/a Med Safe, Inc., a
Colorado, corporation; CWC R&D, INC., a/k/a
CWC Research & Development, Inc., a
Colorado corporation; CHILD SAFETY
SCIENCES, INC., a Delaware corporation,

       Defendants,

JOHN PINNEY; GRAYDON, HEAD &
RITCHEY, an Ohio partnership,

       Defendants-Appellees.

No. 98-1375
(D. Colo.)
(D.Ct. No. 93-D-2343)

_____

**ORDER AND JUDGMENT**[*]

_____

   [*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under

Before **BRORBY**, **McWILLIAMS**, and **KELLY**, Circuit Judges.

Plaintiffs John, Kent, and Scott Kockos appeal from two summary judgment orders entered by the district court in favor of defendants John Pinney and Graydon, Head & Ritchey, [1] which together resolved a twelve-count complaint alleging federal securities law violations; liability under the common law principles of aiding and abetting, fraud, and intentional or negligent misrepresentation; and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* The district court held plaintiffs failed to produce sufficient evidence of at least one element of each cause of action, and defendants were entitled to judgment as a matter of law. [2]

---

the terms and conditions of 10th Cir. R. 36.3.

[1] John Pinney is a partner in the law firm of Graydon, Head & Ritchey. (Ape. Br. at 4.)

[2] The district court also dismissed some of plaintiffs' liability theories for failure to state a claim. Plaintiffs have not appealed this aspect of the district court's ruling.

I.  Background

In 1993, fifteen plaintiffs brought this lawsuit against sixteen defendants [3] alleging fraud involving their investments in securities of Medvial, Inc. ("Medvial"). [4]  Medvial was created to commercialize a child-safe medicinal vial, practicing an invention patented as U.S. Patent No. 4,739,890 [5] ("890 Patent"). Among the defendants no longer in this case were both CWC R&D, Inc. ("CWC"), which owned the 890 Patent, and Carl Cooke ("Cooke"), who invented the 890 Patent and organized CWC.

In January 1990, prior to plaintiffs' investments in Medvial, CWC and Cooke retained defendants to defend them in a dispute involving the 890 Patent. The parties refer to this dispute as the "IPM arbitration."  CWC entered into a security agreement and conditional assignment of the 890 Patent ("security

---

[3]  Only John, Kent, and Scott Kockos remain as plaintiffs after the others settled and dismissed their claims following the district court's first summary judgment order. Only Pinney and Graydon, Head & Ritchey remain as defendants after the others either settled, filed for bankruptcy, or allowed the entry of a default judgment against them.

[4]  Prior to 1992, Medvial, Inc. was known as Med Safe, Inc.  For the sake of clarity, and consistent with the parties' briefs, all references in this order and judgment to Medvial include the time the corporation was called Med Safe, Inc.

[5]  Although plaintiffs' operative complaint lists the patent as No. 4,736,890, it is clear from the record the correct designation is No. 4,739,890.

agreement") with Graydon, Head & Ritchey in order to ensure payment of defendants' legal bills arising from the IPM arbitration. According to the operative complaint, CWC then granted to Medvial an exclusive worldwide license to manufacture and sell 890 Patent products, subject to the results of the IPM arbitration. John, Kent, and Scott Kockos later purchased Medvial securities, after which CWC remained the majority owner of Medvial. Subsequently, defendants sought and received from John Kockos and David Kimmel [6] a "Payment Guarantee" for CWC's legal bills arising from the IPM arbitration. [7]

Plaintiffs' operative complaint alleged defendants perpetrated securities frauds in joint venture and conspiracy with the dismissed defendants, which amounted to a Racketeer Influenced and Corrupt Organizations scheme. Plaintiffs focus on two sets of events: (1) their initial investments in Medvial, and (2) offers made to them to repurchase their shares in Medvial. [8] They claim the

---

[6] Apparently, David Kimmel was the first investor in Medvial.

[7] According to the operative complaint, David Kimmel and John Kockos were both minority shareholders and directors of Medvial when they provided the Payment Guarantee to defendants.

[8] It is undisputed defendants communicated the repurchase offers to plaintiffs via letters. Plaintiffs state the issue is whether defendants presented the offers on their own

existence of the security agreement made defendants primary participants in the alleged securities fraud, and the Payment Guarantee created in defendants a duty to disclose the existence of the security agreement to plaintiffs.

Plaintiffs' appellate brief is very unclear, because they commingle arguments and offer few subject headings to bring any semblance of order to the brief. Having done our best to decipher plaintiffs' argument, we conclude they make nine distinct claims. The first two address the security agreement for the 890 Patent without reference to a particular legal theory: (1) defendants' alleged failure to disclose the existence of the security agreement in and of itself created a genuine issue of material fact for trial; and (2) the security agreement somehow transformed defendants into owners of the 890 Patent.[9] In their next six

_____

behalf, as plaintiffs claim, or on behalf of CWC, as defendants claim. We note all but one of the letters expressing the repurchase offer unambiguously identify CWC as the offeror, while the exception appears to be an incomplete copy which nonetheless can be fairly interpreted to state the same thing. We need not discuss this alleged dispute further, because it is immaterial under the causes of action on appeal dealing with the repurchase offer letters. *See infra* Part III.D, G.

[9] With regard to these two arguments, plaintiffs assert "the exact legal theory does not control the erroneous [summary judgment] ruling of the District Court." This is not the law. As discussed below, an appellate court cannot reverse a summary judgment ruling based on alleged factual disputes without reference to the elements of a particular cause of action. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (describing summary judgment standard). Only genuine issues of material fact preclude a district court from granting a party summary judgment. *See* Fed. R. Civ. P. 56(c).

arguments, plaintiffs claim they presented sufficient evidence to create a genuine issue of material fact as to whether: (3) defendants had a duty to disclose the security agreement under the common law of fraudulent concealment; (4) defendant Graydon, Head & Ritchey was a statutory seller under §§ 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a),[10] when plaintiffs purchased the Medvial securities, and defendants violated § 12(2) with the repurchase offers; (5) defendants had a duty to disclose the security agreement under either § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), or Rule 10b-5, 17 C.F.R. § 240.10b-5; (6) defendants were control persons under § 15 of the Securities Act of 1933, 15 U.S.C. § 77o, or § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a); (7) defendants violated the Williams Act, 15 U.S.C. § 78n, with the repurchase offers; and (8) defendants entered a joint venture or conspiracy with CWC and Cooke. Finally, plaintiffs state: (9) their third through sixth claims on appeal reveal error precluding summary judgment on their Racketeer Influenced and Corrupt Organizations claims. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

[10] In 1995, Congress added another subsection to § 12 of the Securities Act of 1933, which means § 12(1) and § 12(2) claims are now technically § 12(a)(1) and § 12(a)(2) claims. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1303 n.1 (10th Cir. 1998). We will continue to use the terms "§ 12(1)" and "§ 12(2)" for the sake of clarity in light of their use in the district court's orders and the parties' briefs.

II. Standard of Review

We review the grant of summary judgment de novo utilizing the standard described in Rule 56(c). *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Under this standard, we view the evidence and draw reasonable inferences in the light most favorable to the nonmovant. *See Adler*, 144 F.3d at 670.

> An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial.

*Id.* (citations omitted). A movant who will not bear the burden of persuasion at trial satisfies its initial burden on a motion for summary judgment by pointing out to the court the lack of evidence for the nonmovant on an essential element of the nonmovant's claim. *See id.* at 670-71. The burden then shifts to the nonmovant, who must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671 (quoting Fed. R. Civ. P. 56(e)).

Conclusory and self-serving affidavits are insufficient to meet this burden. *See Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995).

III. Discussion

A. Disclosure of the Security Agreement for the 890 Patent

Plaintiffs claim defendants' failure to disclose the security agreement to them in and of itself creates a genuine issue of material fact for trial. This argument fails for two reasons. First, it is undisputed defendants filed the security agreement with the U.S. Patent and Trademark Office, where it was recorded. At oral argument, plaintiffs' counsel conceded plaintiffs thereby had constructive notice of defendants' security interest in the 890 Patent before they purchased the Medvial securities. *Cf.* 15 U.S.C. § 1072 ("Registration of a mark on the principal register ... shall be constructive notice of the registrant's claim of ownership thereof."); *Willson v. Graphol Prod. Co.*, 188 F.2d 498, 504 (C.C.P.A. 1951) ("[I]n the case of ... a patent assignment, ... any prospective purchaser is constructively notified of what the pertinent public records contain and will not be heard to complain that he acted in ignorance of the facts." (citations omitted).) Second, whether or not defendants affirmatively disclosed to plaintiffs the existence of the security agreement is immaterial, because it has no bearing on the essential elements – as to each cause of action on appeal – the district court

-8-

found deficient on summary judgment. *See Adler*, 144 F.3d at 670.

B. Security Agreement and Ownership of the 890 Patent

Plaintiffs claim the district court should have ruled the security agreement somehow transformed defendants into owners of the 890 Patent. Plaintiffs cite only to 37 C.F.R. § 3.56 as support for this proposition. This regulation simply states the U.S. Patent and Trademark Office treats conditional assignments as absolute assignments for its own purposes. *See id.* ("Assignments which are made conditional on the performance of certain acts or events, such as the payment of money or other condition subsequent, if recorded in the Office, are regarded as absolute assignments *for Office purposes*." (emphasis added)); 37 C.F.R. § 3.1 (" *Office* means the [U.S.] Patent and Trademark Office."). This regulation in no way addresses patent ownership. Indeed, another regulation clearly states the recording of a patent assignment by the U.S. Patent and Trademark Office "is not a determination by the Office of the validity of the document or the effect that document has on the title to ... a patent." 37 C.F.R. § 3.54. Accordingly, plaintiffs' claim has no merit and we will not consider it further. *See* Fed. R. App. P. 28(a)(9); *Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992) ("[W]e decline to consider the matter, because ... Plaintiff's appellate position has not been even minimally supported by legal argument or

authority." (citation omitted).) We proceed to look at plaintiffs' appeal of specific legal theories.

C. Fraudulent Concealment

In order to establish a claim for fraudulent concealment, plaintiffs must show as a matter of law that defendants had a duty to disclose the information at issue. *See Berger v. Security Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1383 (Colo. Ct. App. 1990) (utilizing Restatement (Second) Torts 2d §551 (1965) to evaluate the duty to disclose). This determination should precede any further analysis of the other elements. *See id.* at 1383-85. The district court held plaintiffs failed to offer evidence of a relationship that created a duty to disclose. *See* Restatement (Second) Torts 2d § 551(2)(a) (1976) ("One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated ... matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them").

"Despite the crucial nature of the issue, plaintiffs do not cite a single authority or even present a developed argument for ascribing the requisite" duty to disclose on defendants. *Brownlee v. Lear Siegler Mgmt. Serv. Corp.*, 15 F.3d

976, 977 (10th Cir.), *cert. denied*, 512 U.S. 1237 (1994). Rather, we are provided only the unsupported, conclusory assertions that "fraud is a factual issue and the facts as shown above in this brief establish that the [d]istrict court should have allowed this matter to go to trial." This is not adequate appellate argument.[11] *Brownlee*, 15 F.3d at 977-78.

Even if we assume plaintiffs are alleging the existence of a duty by way of an attorney-client relationship between themselves and defendants,[12] plaintiffs failed to come forward with sufficient evidence to allow a rational jury to find such a relationship. In Colorado, "there must be a showing that a person sought and received legal advice from the attorney concerning the legal consequences of the person's past or contemplated action" in order to establish an attorney-client

---

[11] Plaintiffs cite two fraudulent concealment cases in their opening brief, which are unhelpful. The duty to disclose element was not at issue in *Teodonno v. Bachman*, 404 P.2d 284, 285-86 (Colo. 1965), and the court in *Wilbourn v. Mostek Corp.*, 537 F. Supp. 302 (D. Colo. 1982), a case that preceded *Berger*, inappropriately concluded it did not need to find a duty to disclose before engaging in an elements analysis. *See id.* at 305-06.

[12] In Colorado, "[t]he formation of a relationship between an attorney and his or her client is based upon contract, which may be either express or implied by the conduct of the parties." *Turkey Creek, LLC v. Rosania*, 953 P.2d 1306, 1311 (Colo. Ct. App. 1998). Plaintiffs do not claim an express contract existed between themselves and defendants, but state the Payment Guarantee "shows the privity between Appellant John Kockos and Respondent Attorneys." Accordingly, plaintiffs appear to claim defendants' conduct established an attorney-client relationship between them.

relationship based on the conduct of the parties. *Turkey Creek*, 953 P.2d at 1311.

A nonclient's payment of attorney fees on behalf of the client is insufficient. *See id.* at 1312. Accordingly, the Payment Guaranty entered into by John Kockos cannot create such a relationship, especially since it appears undisputed he never made any payment pursuant to this guarantee. Further, the plain language of the Payment Guarantee does not reflect any effort by John Kockos to obtain legal advice concerning his past or contemplated action, nor does it contain any representation by defendants regarding the initiation of an attorney-client relationship with him. The guarantee of payment, standing alone, is insufficient to show an attorney-client relationship.

We therefore affirm the district court's decision to grant summary judgment for defendants on plaintiffs' fraudulent concealment claim.

D. Sections 12(1) and 12(2) of the Securities Act of 1933

In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court held liability for the unlawful sale of unregistered securities under § 12(1) of the Securities Act of 1933 extends to both the person who passes title to the securities and "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at

647. However, "[b]eing merely a 'substantial factor' in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under § 12(1)." *Id.* at 654. Therefore, § 12(1) liability does not attach to lawyers "whose involvement is only the performance of their professional services." *Id.* at 651. Citing to John Pinney's affidavit,[13] the district court held plaintiffs failed to establish a genuine issue of material fact on the elements of passing title to or soliciting the purchase of the Medvial securities. Specifically, it held "plaintiffs failed to produce evidence sufficient to create a genuine issue of material fact whether, in connection with plaintiffs' acquisition of securities, [defendants]

---

[13] The district court cited, in part, the following portions of John Pinney's affidavit:

> At all times that [defendants] had any communications with plaintiffs, [defendants] did so as attorneys for Cooke or CWC.
> ....
> [Defendants] did not participate in or plan any of the discussions or communications between Cooke/CWC and any of the plaintiffs in connection with plaintiffs' acquisition of stock in Medvial; any interest in any of the Medvial license royalties; or any distribution rights from Medvial.
> [Defendants] did not furnish or supply any information to any of the plaintiffs in connection with any of their alleged securities transactions.
> [Defendants] did not furnish any written opinion to or for any plaintiff in connection with any of the transactions or discussions that any plaintiff had relating to stock in Medvial; distribution rights from Medvial; or any Medvial license royalties.
> With the possible exception of J. Kockos, [defendants] had no communication whatsoever with any of the plaintiffs before they acquired any stock in Medvial; any interest in the Medvial license royalties; or any distribution rights from Medvial.

acted in a capacity other than that of attorneys performing professional services for their clients."

On appeal, plaintiffs concede defendants did not pass title to the Medvial securities, but claim their Supplemental Declarations presented sufficient evidence to create a genuine issue of material fact as to whether defendants solicited and encouraged their investments in Medvial. However, these declarations do not set forth specific facts about any contact or information exchanged between plaintiffs and defendants with regard to the acquisition of the Medvial securities. Rather, they are full of conclusory and self-serving statements that do not create a genuine issue of material fact. *See* Fed. R. Civ. P. 56 (e); *Murray*, 45 F.3d at 1422. For example, all three declarations contain the following identical language:

> [Defendants] communicated directly with Kimmel, Kockos and Kimmel's attorney Mallette, to plan Medvial's formation with the Kimmel Agreement, which Pinney revised and approved in final form .... [Defendants] revised and approved the Medvial License which misrepresented CWC's exclusive ownership of the 890 Patent and failed to disclose the [Graydon, Head & Ritchey] interest in the 890 Patent, a material document given to minority investors to induce their investment contracts (exclusive rights to exploit 890 Patent products), upon which I relied in making my investment decision. This affirmative misrepresentation of CWC's exclusive ownership and rights to the 890 Patent was passed on by [defendants] to underwriters, knowing the false information would be communicated to me, either orally, or by submission to me of the Medvial License document, which I received and reviewed, and

relied upon, prior to my investment decision.

First, it is unclear which "Kockos" was allegedly involved in direct communications with defendants. Second, plaintiffs do not provide record citations for either the "Kimmel Agreement" or "Medvial License." Third, plaintiffs appear to concede the "Medvial License" was not directly communicated to them by defendants, but rather it went from defendants to "underwriters" to them. Finally, plaintiffs do not provide any citation to evidence supporting their assertion defendants "revised and approved" the "Kimmel Agreement" and "Medvial License."

We note defendants produced a copy of an "Agreement" between David Kimmel and CWC as well as a "License Agreement" between CWC and Med Safe, Inc. Even assuming these are the documents to which plaintiffs were referring, plaintiffs have not provided any specific facts to dispute that: (1) the only relationship between defendants and Cooke/CWC at this point in time was attorney-client, in light of the IPM arbitration; (2) Cooke requested defendants review these two documents only for the purpose of suggesting revisions to conform them to the anticipated litigation positions of CWC and Cooke in the IPM arbitration; (3) defendants are not parties or signatories on the documents; (4) the documents do not contain any warranty, representation, or guaranty of

defendants; and (5) defendants did not provide a written opinion to anyone regarding the accuracy or sufficiency of any of the provisions of the two documents. We therefore affirm the district court's decision to grant summary judgment for defendants on plaintiffs' § 12(1) claims, because such liability does not attach to lawyers whose only involvement is the performance of their professional services. *See Pinter*, 486 U.S. at 651, 654.

"Under § 12(2) of the Securities Act of 1933, buyers have an express cause of action for rescission against sellers who make material misstatements or omissions 'by means of a prospectus.'" *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 564 (1995) (quoting 15 U.S.C. § 77l(a)(2)). The existence of a prospectus is an essential element of the cause of action. *See id.* at 567-68. In this case, the district court granted defendants' summary judgment motion because plaintiffs failed to create a genuine issue of material fact as to whether: (1) they had received a prospectus in connection with their purchase of the Med Vial securities, and (2) defendants were a statutory seller of the Med Vial securities. Plaintiffs challenge only the statutory seller holding. Because, regardless of whether defendants are statutory sellers, plaintiffs must present evidence of a prospectus, we affirm the district court's decision to grant summary judgment for defendants based on its uncontested ruling regarding plaintiffs' failure to create a

genuine issue of material fact that they had received a prospectus. *See Griffin v. Davies* , 929 F.2d 550, 554 (10th Cir.) ("We will not undertake to decide issues that do not affect the outcome of a dispute."), *cert, denied* , 502 U.S. 878; *Snell v. Tunnell* , 920 F.2d 673, 676 (10th Cir. 1990) (citing case law supporting the court's refusal to decide an issue "when the party adversely affected had not appealed the adverse order"), *cert. denied* , 499 U.S. 976 (1991). [14]

E. Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

There is no liability under § 10(b) of the Securities Exchange Act of 1934 or Rule 10b-5 for failure to disclose information absent a duty to do so. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* , 511 U.S. 164, 174 (1994) (section 10(b)); *Arst v. Stifel, Nicolaus & Co., Inc.* , 86 F.3d 973, 981 (10th Cir. 1996) (Rule 10b-5). "'[T]he duty to disclose arises when one

---

[14] Plaintiffs' appellate brief focuses heavily on the repurchase offers communicated to them by defendants. Language contained in their discussion of § 12(2) appears to reference this portion of their brief and could be construed as an appeal of the district court's ruling "the express language of § 12(2) applies only to offers to sell or distribute securities, not to offers to purchase." We agree with the district court. *See* 15 U.S.C. § 77l(a)(2) ("Any person who ... offers or sells a security [with material misstatements or omissions] ... shall be liable ... to the person purchasing such security from him."). Therefore, the alleged dispute whether CWC or defendants were the offeror is immaterial. *See Adler*, 144 F.3d at 670. Accordingly, we affirm the district court's decision to grant defendants' motion for summary judgment for failure to demonstrate a genuine issue of material fact whether the repurchase offers involved any offering or sale of a security.

party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Arst*, 86 F.3d at 981 (citing *Windon Third Oil & Gas Drilling P'ship v. Federal Deposit Ins. Corp.*, 805 F.2d 342, 347 (10th Cir. 1986)). The district court held plaintiffs failed to present sufficient evidence to create a genuine issue of material fact as to whether a relationship of trust and confidence existed between them and defendants.

On appeal, plaintiffs claim there was a relationship of trust and confidence between themselves and defendants, but do not provide any citations to the record for evidence of such a relationship. Instead, they merely state:

> [Defendants'] status at the time of [plaintiffs'] investments was: (1) counsel for Cooke, the controlling shareholder of offeror CWC; (2) counsel for CWC, an offeror; (3) counsel for Medvial[;] (4) counsel in the IPM litigation representing an identity of [Graydon, Head & Ritchey], Cooke, CWC, Medvial, and Medvial minority investors' interests to defeat IPM 890 Patent claims and collect the IPM Note; (5) [Graydon, Head & Ritchey], as assignee of 90 [sic] Patent interests, was itself a statutory seller; and[] (6) by solicitous behavior [defendants] were statutory underwriters. [Defendants'] status in relationship to the offerings imposes a duty to disclose under § 10(b) and Rule 10b-5.
>
> ...
>
> In addition, [defendants]: (1) obtained individual personal guarantees from Medvial directors Kimmel and John Kockos of [defendants'] attorney fees; (2) had ongoing communications with Medvial RSD investors regarding interruption in product and other

-18-

disputes; (3) negotiated with investors to repurchase their interests. All [plaintiffs] relied on [defendants] in a relationship of trust and confidence, as Medvial's counsel to fully disclose and accurately communicate the particulars of the offers.

These unsupported, conclusory assertions do not create a genuine issue of material fact as to a relationship of trust and confidence between plaintiffs and defendants, *see* Fed. R. Civ. P. 56(e); *Murray*, 45 F.3d at 1422, and we decline to sift through the record in search of evidentiary support for plaintiffs' assertions. *See Securities & Exch. Comm'n v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992). [15] We therefore affirm the district court's decision to grant summary judgment for defendants on plaintiffs' § 10(b) and Rule 10b-5 claims for fraud by omission. [16]

### F. Control Person Liability

---

[15] The two cases cited by plaintiffs in support of their control person claims are inapposite. The duty to disclose element was neither discussed nor at issue in *Shumate v. McNiff*, No. 88 CIV 6820 (JFK), 1990 WL 6549, at *1, 3-5 (S.D. N.Y. Jan. 23, 1990), and *Odesser v. Continental Bank*, 676 F. Supp. 1305 (E.D. Pa. 1987) does not address § 10(b) or Rule 10b-5.

[16] Finally, we will not address plaintiffs' reply brief argument that summary judgment was inappropriate on its affirmative misrepresentation claim under § 10(b) of the Securities Exchange Act of 1934, because they did not raise it in their opening brief, it does not go to jurisdiction, and defendants' discussion of this claim in its brief does not provide an alternative basis for its arguments on any of the claims raised by plaintiffs in their opening brief. *See Sadeghi v. INS*, 40 F.3d 1139, 1143 (10th Cir. 1994) (refusing to consider issues raised for the first time in a reply brief "except when those issues relate to jurisdictional requirements" or when appellant is responding to an argument raised in appellee's brief that addresses an issue raised in appellant's opening brief).

Under § 15 of the Securities Act of 1933 and § 20(a) of the Securities Exchange Act of 1934, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator." *Maher*, 144 F.3d at 1304-05. To state a *prima facie* case of control person liability, plaintiffs "must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Id.* at 1305. In this case, the district court held plaintiffs failed to produce evidence sufficient to create a genuine issue of material fact whether defendants had "control" – defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *see Maher*, 144 F.3d at 1305 (citing with approval the SEC's "broad definition of 'control'" in 17 C.F.R. § 230.405). On appeal, plaintiffs claim to "have introduced evidence to satisfy that two prong test" in the regulation, but do not explain how they have done so or provide any citations to the record. This unsupported, conclusory assertion does not create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e); *Murray*, 45 F.3d at 1422. Moreover, none of the factual evidence we have reviewed establishes this element. We therefore affirm the district court's decision to grant summary judgment for defendants on plaintiffs' control person liability claims.

G.  Williams Act

In the portion of their appellate brief addressing § 10(b), Rule 10b-5, and control person liability, plaintiffs appear to challenge the district court's conclusion defendants did not violate the disclosure requirements and anti-fraud provisions of §§ 14(d) and (e) of the Williams Act in connection with the repurchase offers.  *See* 15 U.S.C. §§ 78n(d), (e).  The district court held plaintiffs failed to produce sufficient evidence to create a genuine issue of material fact as to whether the repurchase offers were tender offers covered by the Williams Act.

Sections 14(d) and (e) apply to a "tender offer."  15 U.S.C. §§ 78n(d)(1), (e).  The district court held a tender offer is defined as "a general, publicized bid by an individual or group to buy shares of a publicly[] owned company, the shares of which were traded on a national securities exchange, at a price substantially above the current market price."  *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 54-55 (2d Cir. 1985) (citing legislative history of the Williams Act).  Plaintiffs do not challenge this legal ruling.  Assuming, without deciding, this is a correct statement of the law, we note plaintiffs have not cited any evidence the repurchase offer letters were a "general, publicized bid," Medvial is a publicly-owned company, or Medvial securities were traded on a national securities exchange.  Moreover, none of the factual evidence we have reviewed establishes

-21-

any of these criteria. We therefore affirm the district court's decision to grant summary judgment for defendants on plaintiffs' Williams Act claims.

H. Joint Venture or Conspiracy

In Colorado, an essential element of joint venture liability is the existence of "an express or implied agreement [between the alleged joint venturers] to share in profits or losses of the venture." *Hancock Constr. Co. v. Cummins*, 791 P.2d 1208, 1209 (Colo. Ct. App. 1990). The district court concluded plaintiffs failed to produce sufficient evidence to create a genuine issue of material fact as to whether defendants entered into such an agreement with CWC or Cooke. On appeal, plaintiffs claim there exist "issues of material fact for trial concerning profit-sharing arising from [defendants'] deferral of fees and the active participation in ... the ongoing CWC enterprise," but again provide no citations to the record. Such unsupported, conclusory assertions do not create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e); *Murray*, 45 F.3d at 1422.

In the alternative, plaintiffs claim a written agreement is unnecessary to create a joint venture and the security agreement fulfills the element of joint venture liability requiring a joint interest in property. However, on summary judgment, issues concerning all other elements of the claim become immaterial if

the plaintiffs do not come forward with sufficient evidence on any essential element of the cause of action. *See Adler*, 144 F.3d at 670. Accordingly, we affirm the district court's decision to grant summary judgment for defendants in light of plaintiffs' failure to produce sufficient evidence on the element of a profit sharing agreement.

Regarding plaintiffs' conspiracy claim, the district court held as a matter of law an attorney acting within the scope of the attorney-client relationship cannot conspire with his client, as long as the attorney does not actively participate in a fraud. *See Astarte, Inc. v. Pacific Indus. Sys., Inc.*, 865 F. Supp. 693, 708 (D. Colo. 1994) (applying Colorado law in a diversity case). Plaintiffs do not challenge this legal ruling. Rather, they appear to focus on the fraud exception to this rule, implying the alleged error by the district court on the fraudulent concealment claim infects its decision on this issue. [17] In light of our ruling above that no such error occurred on the fraudulent concealment claim, we affirm the district court's decision to grant defendants' summary judgment motion on plaintiffs' conspiracy claim.

---

[17] We decline to address plaintiffs' argument that an attorney for a corporation has the same fiduciary duties as a director, because we fail to see how it has anything to do with their conspiracy claim.

I.  Racketeer Influenced and Corrupt Organizations Act

Plaintiffs appear to base their appeal of the district court's ruling under the Racketeer Influenced and Corrupt Organizations Act on their claims the district court erred in granting summary judgment for defendants on the fraudulent concealment and federal securities law claims.  In light of our above rulings that no such errors exist, we affirm the district court's grant of summary judgment to defendants here as well.


IV.  Conclusion

The judgment of the United States District Court for the District of Colorado is  **AFFIRMED** .


        **Entered by the Court:**

        **WADE BRORBY**
        United States Circuit Judge