Filed 1/30/26  Ocampo v. Stiftung CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DANIEL OCAMPO,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>DFINITY STIFTUNG,<br><br>        Defendant and Respondent. | A173226<br><br>(San Mateo County<br>Super. Ct. No. 21-CIV-03843)<br><br>**[REDACTED]** |

Daniel Ocampo sued Dfinity Stiftung (Dfinity)[1] for selling unregistered securities in violation of section 12 of the Securities Act of 1933 (15 U.S.C. § 77a et seq.; Securities Act).  The trial court granted Dfinity's motion for summary judgment on the basis that Ocampo failed to establish a triable

---

[1] Ocampo also named Dfinity USA Research, LLC, AH Capital Management, LLC, Polychain Capital LP, and Dominic Williams as defendants.  The trial court dismissed AH Capital Management and Polychain Capital with prejudice, granted voluntary dismissal of Williams, and sustained Dfinity USA Research's demurrer to the complaint without leave to amend.  Ocampo does not appeal those orders and we therefore limit our discussion to the claim brought against Dfinity Stiftung.

The complaint was originally filed as a putative class action on behalf of all individuals who purchased Internet Computer Protocol tokens on or after May 10, 2021, and suffered losses, but the trial court denied Ocampo's motion for class certification.  Ocampo does not challenge that order on appeal.

1

issue of fact as to whether Dfinity was a statutory seller for purposes of his Securities Act claim. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*General Background*

Dfinity is a nonprofit foundation, or "Stiftung," headquartered in Switzerland that is engaged in the development of a decentralized blockchain version of the internet called the "Internet Computer."

As part of its Internet Computer project, Dfinity created a native cryptocurrency and governance token called the Internet Computer Protocol (ICP) token. In May 2021, Dfinity minted over 469 million ICP tokens during its "Genesis Launch," at which point ICP tokens began trading on multiple electronic cryptocurrency trading platforms, including that of Coinbase, Inc. (Coinbase).

ICP tokens are not registered securities with the Securities and Exchange Commission (SEC). We assume for purposes of this appeal that ICP tokens are securities as it does not change the outcome but do not make a finding on that issue. Dfinity maintains ICP tokens are not securities but acknowledges we need not reach that issue.

In 2021, Ocampo purchased ICP tokens on Coinbase and ultimately suffered financial losses on those investments; those losses underlie his lawsuit for sale of unregistered securities in this case. Leading up to the Genesis Launch, Ocampo viewed various communications from Dfinity and its director regarding the Internet Computer project and ICP tokens.

Dfinity was not a counterparty to any of Ocampo's ICP token transactions. However, Ocampo made two ICP token purchases from Wintermute Trading Ltd. (Wintermute), a U.K.-based market maker with which Dfinity had entered into a "Liquidity Consulting and Loan Agreement"

2

(Wintermute Agreement or the Agreement) prior to the Genesis Launch. A market maker is an entity that provides market liquidity by buying and selling a particular asset on the market, earning profits from the "bid-ask spread" (i.e., the difference between the price at which it sells and buys the asset).

This appeal turns on whether Dfinity is liable as a statutory seller under the Securities Act based on either (1) the Wintermute transactions and, by extension, the Wintermute Agreement, or (2) successful solicitation of Ocampo's purchases of ICP tokens through its promotional material.

*The Complaint*

In the operative third amended complaint (complaint), Ocampo asserted one cause of action against Dfinity: the unregistered offering and sale of securities in violation of sections 5 and 12 of the Securities Act (15 U.S.C. §§ 77e & 77*l*).[2]  The complaint asserted Dfinity qualified as a "statutory seller" under section 12(a)(1) of the Securities Act (section 12) because Dfinity (1) was his " 'immediate seller' " of ICP tokens and (2) actively solicited the sale of ICP tokens to him with a motivation to serve its financial interest.  (See *Pinter v. Dahl* (1988) 486 U.S. 622, 644, fn. 21, 647 (*Pinter*) [defining statutory seller for purposes of section 12].)  The trial court overruled Dfinity's demurrer to the section 12 claim, finding Ocampo pled facts establishing Dfinity was either the immediate seller of the ICP tokens Ocampo purchased in the Genesis Launch, or that Dfinity passed title to at least some of the ICP tokens he bought on Coinbase.

---

[2] In prior versions of the complaint, Ocampo had asserted a second cause of action against Dfinity under section 15 of the Securities Act (15 U.S.C. § 77o).  This claim was not asserted in the second or third amended complaints and we therefore do not address it.

*Discovery*

The court ordered the parties to conduct discovery related to the issue of whether Dfinity was a statutory seller of the ICP tokens purchased by Ocampo. We briefly summarize the relevant evidence here and delve into it further in the Discussion section, *post*.

Ocampo purchased ICP tokens only on Coinbase. As is typical for any Coinbase user, Ocampo did not know the identity of the parties or entities he transacted with when he bought his ICP tokens. Dfinity was not a counterparty to any of his ICP token transactions, but Wintermute was the counterparty to two of the transactions.

Pursuant to the Wintermute Agreement, Dfinity loaned Wintermute 702,000 ICP tokens for trading on various cryptocurrency exchanges, such as Coinbase; the tokens were loaned at a 0 percent interest rate for a term of 12 months. Dfinity's vice-president of finance, Paul Meeusen, provided testimony (by declaration) that Wintermute never acted as an agent for Dfinity and all of Wintermute's transactions in ICP tokens were for Wintermute's own account. Dfinity also provided a report authored by global financial markets expert Matthew A. Evans (Evans Report), who explained that Wintermute and other market makers bore the traditional risks of trading the loaned ICP tokens under the Wintermute Agreement.

Ocampo testified (by deposition) that he did not have direct communications with Dfinity prior to his purchase of ICP tokens, but had viewed promotional materials in May 2021 from Dfinity and its principals before buying the tokens. He read articles, viewed interviews, and watched online presentations by Dfinity's director, Dominic Williams, in which Williams touted the technology, research, and development behind the

4

Internet Computer itself and described the ICP token as "the next best thing."

*Motion for Summary Judgment*

In September 2024, Dfinity moved for summary judgment on the basis that the evidence adduced in discovery demonstrated it was not a statutory seller of ICP tokens within the meaning of section 12 as it did not either pass title to Ocampo of ICP tokens or successfully solicit his purchase. First, Dfinity noted it was not the counterparty to any of his Coinbase transactions and argued the Wintermute Agreement showed that the Wintermute transactions were independently made with that market maker, who was not acting as Dfinity's agent. Second, Dfinity contended there was no solicitation as Ocampo conceded he did not have direct communications with Dfinity, and any general advertising and promotion of the ICP tokens was insufficient to establish liability.

In opposition, Ocampo submitted a declaration by counsel with various exhibits attached, including the Wintermute Agreement, agreements between Dfinity and other market makers, an agreement between Dfinity and Coinbase Custody International Limited (Coinbase Custody), and an excerpt of Meeusen's deposition.[3] Ocampo argued there was a triable issue of fact as to whether Dfinity passed title of ICP tokens to Wintermute or merely loaned them, thereby passing title directly to Ocampo. He also asserted there was a triable issue as to whether Wintermute was Dfinity's agent. Finally, Ocampo contended his viewing of promotional materials by Dfinity amounted to a solicitation of his ICP token purchases.

_____

[3] We grant Ocampo's unopposed September 22, 2025 request for judicial notice of counsel's declaration in support of the opposition, including the exhibits attached to that declaration. (Cal. Rules of Court, rule 8.252(a).)

5

*Trial Court's Motion for Summary Judgment Ruling*

The trial court held a hearing in February 2025 and then granted the motion for summary judgment. The court noted that, under *Pinter*, Ocampo was required to show Dfinity was a statutory seller for purposes of section 12 on the basis that Dfinity either (1) passed title of the ICP tokens or (2) solicited his purchase with a self-interested financial motive. (*Pinter*, *supra*, 486 U.S. at pp. 641–643, 647.)

The court addressed two potential grounds for passage of title liability: whether Wintermute acted as Dfinity's agent, and whether the characterization of the Wintermute Agreement as providing ICP tokens as a loan meant title effectively passed directly from Dfinity to Ocampo. The court concluded neither element of agency (manifestation of consent for one party to act as an agent on the principal's behalf or consent by the principal) was present under the Wintermute Agreement, nor could Ocampo show Wintermute was Dfinity's ostensible agent because he had no knowledge he was transacting with Wintermute when he bought ICP tokens on Coinbase. The court also concluded that, assuming an ICP token is a security, Dfinity's loan of ICP tokens to Wintermute qualified as a sale under the Securities Act and thus title did not pass directly from Dfinity to Ocampo.

The court also found Dfinity did not directly contact or solicit ICP token purchases from Ocampo; rather, he "subscribed to and paid attention to many third-parties on various social media platforms opining about ICP token[s]" as part of "the usual circuit of promotion every time a new product is imminently about to be released to the public." The court found this insufficient to establish solicitation liability under the governing caselaw from Division Two of this court, *Jensen v. iShares Trust* (2020) 44 Cal.App.5th 618 (*Jensen*).

6

Accordingly, the trial court concluded Ocampo failed to establish a triable issue of fact as to whether Dfinity was a statutory seller, a required element of his section 12 claim, and Dfinity was entitled to judgment as a matter of law.

## DISCUSSION

The central question in this appeal is whether Dfinity is a statutory " 'seller' " for purposes of section 12 of the Securities Act such that it could be liable for the sale of unregistered securities.  (*Pinter*, *supra*, 486 U.S. at pp. 641–642.)

In *Pinter*, the Supreme Court construed the Securities Act to mean that liability as a statutory seller under section 12 extends to only two classes of defendants.  First, those who "passed title, or other interest in the security, to the buyer for value"; however, such liability is imposed on "only the buyer's immediate seller," and "a buyer cannot recover against his seller's seller" or other "remote sellers."  (*Pinter*, *supra*, 486 U.S. at pp. 641–643 & fn. 21.)  And second, because the Securities Act defines " 'offer' to include . . . 'solicitation of an offer to buy, a security,' " *Pinter* held that liability also extends to a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  (*Pinter*, at pp. 643, 647, quoting 15 U.S.C. § 77b(3).)

Ocampo avers he created triable issues of material fact as to (1) whether Dfinity passed title via the Wintermute transactions, and (2) whether Dfinity solicited his purchases of ICP tokens.  We address each basis in turn and conclude no triable issues of fact exist.

## I. Standard of Review

Summary judgment is appropriate where there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.

(*Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.) We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. (*Ibid.*) "As in the trial court, we first determine whether the moving party has met its initial burden to establish facts justifying judgment in its favor; if so, we then decide whether the opposing party has demonstrated the existence of a triable, material issue of fact." (*Miller v. Pacific Gas & Electric Co.* (2023) 97 Cal.App.5th 1161, 1166.)

## II. No Triable Issues Exist as to Whether Dfinity Passed Title or Other Interest as Ocampo's Immediate Seller of ICP Tokens

"[A] buyer cannot recover against his seller's seller" under section 12. (*Pinter*, *supra*, 486 U.S. at p. 643, fn. 21.)

It is undisputed that Dfinity was not a counterparty to any of Ocampo's purchases of ICP tokens. Nonetheless, Ocampo contends he purchased ICP tokens *from Dfinity* via the Wintermute transactions because Dfinity retained title to the loaned ICP tokens. Alternatively, he seeks to impose section 12 liability on Dfinity by claiming Wintermute was Dfinity's agent. We are not convinced.

### A. Additional Background

*Wintermute Agreement*

The Wintermute Agreement contains the following relevant provisions.

Both Dfinity and Wintermute are "independent contracting parties" and "[n]either Party will have, or hold itself out as having, any right or authority to incur any obligation on behalf of the other Party." The agreement provided for the following.

Dfinity loaned 702,000 ICP tokens to Wintermute with no setup fee and a 0 percent interest rate for 12 months. At the end of the 12-month period, the loan would mature and Wintermute was required to repay the loan.

8

Wintermute could only use the loaned tokens for performance of its obligations under the contract.

In exchange, Wintermute agreed to provide liquidity for ICP tokens, in other words ensure the tokens could be easily bought or sold, on various trading platforms. The bid/ask spread was to be "no more than 75 basis points, at least 90% of the time," and Wintermute was to provide daily reports of market activity to Dfinity. Wintermute's compensation was "limited to the trading fees, including maker/taker fees, and the difference between bid/ask spreads, that [Wintermute] receives from transactions" on the various exchanges.

Either party had the right to terminate the Agreement if the other party materially breached its confidentiality provisions. Further, Dfinity could terminate if Wintermute materially breached *any* of the Agreement's terms, subject to notice and a cure period.[4]

*Dfinity's Other Agreements*

Dfinity entered into similar agreements with other market makers, including Amber Technologies Limited (Amber Agreement) and GSR Markets Limited (GSR; GSR Agreement). Like the Wintermute Agreement, **[REDACTED]**.

Unlike both the Wintermute Agreement and Amber Agreement, the GSR Agreement contained an additional provision stating: "For the avoidance of doubt, any ICP [tokens] delivered to GSR **[REDACTED]** shall be by way of and deemed a title transfer . . . ."

---

[4] Though the Agreement stated Wintermute had the right to terminate if Dfinity failed to pay any fee when due, it also stated that Dfinity did not owe any fees to Wintermute, so that provision does not appear to provide Wintermute a viable option for termination.

By contrast, Dfinity executed a "Custodial Services Agreement" with Coinbase Custody (Coinbase Agreement) in December 2020 related to listing ICP tokens on that platform; that agreement expressly disclaimed taking title to any ICP tokens listed or traded on the Coinbase platform.

*Evans Report*

Evans, the global financial markets expert retained by Dfinity, stated that "Wintermute and the other market makers bear the traditional risks inherent in liquidity provisioning on multiple trading platforms"; they are at risk for any losses and benefit from any gains that occur in the normal course of trading, and those losses or gains are not transferred back to Dfinity. The risks include "potential losses (both realized and unrealized), collateral calls, fees, and any other associated costs."

Evans explained that after the 12-month loan period, "Wintermute could return the 702,000 ICP Tokens borrowed from [Dfinity] or exercise [a] purchase option and purchase the ICP tokens for a predetermined price."

Evans stated that the market making services provided by Wintermute and the other market makers are similar to those provided by firm commitment underwriters in traditional stock markets, "who acquire stock from an issuer and then resell it on the market in an attempt to gain a profit" but bear the risks of any losses that may result.

Ocampo did not provide any evidence to rebut the Evans Report.

*Meeusen Testimony*

Meeusen, Dfinity's vice-president of finance, submitted a sworn declaration stating "Wintermute bought and sold ICP tokens entirely for its own account," "Wintermute acted independently in its market making activities," and "[a]t no time did Wintermute transact in ICP tokens as an agent for [Dfinity]."

10

Ocampo deposed Meeusen.  The excerpt of Meeusen's deposition provided in support of Ocampo's opposition to the motion for summary judgment did not include any questioning regarding his sworn statement or whether Wintermute acted independently or as Dfinity's agent.  Rather, Meeusen acknowledged that the Wintermute Agreement did not state that Dfinity passed title of ICP tokens to Wintermute and instead referred to a "loan" of ICP tokens.  Similarly, Meeusen referred to Dfinity loaning ICP tokens pursuant to **[REDACTED]**.

## B. Dfinity Was Not the Immediate Seller of the ICP Tokens in the Wintermute Transactions

Ocampo asserts genuine issues of fact exist as to whether Dfinity retained title to the ICP tokens loaned to Wintermute and the trial court erred in concluding otherwise.  The trial court did not err.

The Securities Act defines "sale" to include "every contract of sale or disposition of a security or interest in a security, for value."  (15 U.S.C. § 77b(a)(3).)  Noting the definition is not limited to a traditional sale but also includes a "disposition," the United States Supreme Court has interpreted a sale under the Securities Act to include stocks used as collateral security for a loan. (*Rubin v. United States* (1981) 449 U.S. 424, 429 (*Rubin*).)  *Rubin* reasoned that, although stock pledged as collateral "transfer[s] less than absolute title, the interest . . . transferred nonetheless is an 'interest in a security' " within the meaning of the statute as it "unmistakably" involves disposition of security interest for value.  (*Ibid.*)

Similarly, the 702,000 ICP tokens "loan[ed]" to Wintermute for its market making transactions may have transferred less than absolute title but nonetheless disposed of Dfinity's interest in a security under the Securities Act (assuming ICP tokens are securities).  (See *Rubin*, *supra*, 449

11

U.S. at p. 430 ["It is not essential under the terms of the [Securities] Act that full title pass to a transferee for the transaction to be . . . a 'sale.' "].) Further, Dfinity received value for its disposition of the ICP tokens in the form of market liquidity provided by Wintermute's market making activities. Thus, the Wintermute Agreement "unmistakably" involved disposition of a security or interest for value and qualified as a sale under the Securities Act. (*Rubin*, at p. 429.)

As the trial court noted, this conclusion is supported by guidance from the SEC, which provides that "[w]hile a security is on loan, the borrower is the legal owner of the security" and a securities loan involves the "lender, also known as the beneficial owner, temporarily transfer[ring] legal right to a security to the borrower . . . in exchange for compensation." (Securities and Exchange Com., Reporting of Securities Loans, 88 Fed.Reg. 75696, 75695 (Nov. 3, 2023), codified at 17 C.F.R. § 240.)

Ocampo's reliance on the GSR and Coinbase Agreements to urge a contrary conclusion is without merit. Ocampo contends that, because the GSR Agreement contained the additional provision stating, "For the avoidance of doubt, any ICP delivered to GSR **[REDACTED]** shall be by way of and deemed a title transfer . . . ," which was absent from the Wintermute and Amber Agreements, there is an issue as to whether the Wintermute Agreement was deemed a title transfer. However, as previously explained, **[REDACTED]**. The inclusion of the "[f]or the avoidance of doubt" language merely confirms what the parties understood to be the case in all three agreements: that the ICP loan was effectively a title transfer. Contrary to Ocampo's assertion, that Coinbase Custody—an asset storage connected to a trading *platform*—expressly disclaimed taking title to ICP tokens that were

12

stored in a custodial account is of no import for purposes of the Wintermute Agreement.

Accordingly, Ocampo has failed to establish a triable issue of fact as to whether Dfinity was his immediate seller of ICP tokens via the Wintermute transactions.

## C. Wintermute Was Not Dfinity's Agent

Ocampo next argues that triable issues exist as to whether Wintermute was Dfinity's agent. Even assuming, arguendo, liability under the Securities Act can be imputed to a principal on a principal/agent basis, Ocampo has not established a genuine issue of fact on this ground.

"There are two types of agency—actual and ostensible. Actual agency is based on *consent*, and turns on whether the principal has the right to control the agent's conduct. [Citations.] Ostensible agency is based on *appearances*, and turns on whether . . . 'the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent' even though the third person is not *actually* an agent." (*Pereda v. Atos Jiu Jitsu LLC* (2022) 85 Cal.App.5th 759, 768.)

Ocampo has failed to establish either actual or ostensible agency. As to actual agency, his assertion that the Wintermute Agreement gave Dfinity "control over Wintermute's distribution efforts on its behalf" is belied by the record. That Wintermute could use the ICP tokens only for performance of its obligations under the Wintermute Agreement does not mean Dfinity exercised control over Wintermute's trading efforts. Rather, as the Evans Report explained, the services provided by Wintermute are akin to those provided by firm commitment underwriters who acquire and trade stock while bearing the risks inherent in doing so. Further, as Meeusen explained

13

in his unrebutted declaration, Wintermute acted independently and not as Dfinity's agent.

Ocampo's assertion that Dfinity had the right to unilaterally terminate the Wintermute Agreement for any breach also does not show Dfinity had *control* over Wintermute's trading activity. (See *UFCW & Employers Benefit Trust v. Sutter Health* (2015) 241 Cal.App.4th 909, 931 [" 'In the absence of the essential characteristic of the right of control, there is no true agency.' "].) In any event, though more limited, Wintermute had the ability to terminate the Agreement for certain breaches.

Ocampo also argues GSR, unlike Wintermute, was *not* Dfinity's agent because GSR took title to the ICP tokens delivered by Dfinity. As we have explained, Ocampo's attempt to distinguish between GSR's and Wintermute's rights to the ICP tokens on that basis is unavailing. (Section II.B, *ante*, at pp. 13–14.) Thus, Ocampo has failed to establish a triable issue as to actual agency.

Finally, we readily dispose of Ocampo's suggestion that Wintermute was Dfinity's ostensible agent, which requires a showing that Ocampo, "when dealing with the agent, did so 'with [a reasonable] belief in the agent's authority.' " (*Pereda v. Atos Jiu Jitsu LLC*, *supra*, 85 Cal.App.5th at p. 768.) Given Ocampo's concession that he did not have knowledge of his counterparties when buying ICP tokens on Coinbase, he cannot establish he had a reasonable belief in Wintermute's authority.[5]

---

[5] Even if we were to credit Ocampo's assertion that he "has not been given a reasonable opportunity to obtain further discovery" on the issue of ostensible agency, he fails to explain how any additional discovery would create a genuine issue as to whether he reasonably believed he was dealing with Wintermute as an agent of Dfinity when he unknowingly purchased ICP tokens from Wintermute.

14

Therefore, no triable issue of fact exists as to whether Dfinity is liable under section 12 as an immediate seller to Ocampo.

## III. No Triable Issues Exist as to Whether Dfinity Successfully Solicited Ocampo's ICP Token Purchases

As Dfinity was not an immediate seller of the ICP tokens to Ocampo, the only way Ocampo could potentially establish Dfinity's liability under section 12 would be if Dfinity "successfully solicit[ed]" his ICP token purchases, "motivated at least in part by a desire to serve" Dfinity's own financial interests. (*Pinter*, *supra*, 486 U.S. at p. 647.) Ocampo has failed to establish an issue of triable fact on this basis.

### A. Additional Background

Ocampo alleged Dfinity promoted its Internet Computer project and ICP tokens through its webpage, blog posts, articles, statements at conferences, tweets, virtual events, and press tours. The complaint alleged various instances in which Dfinity (or others on its behalf) promoted the Internet Computer technology and highlighted that venture capitalists and other sophisticated investors provided " 'big backing' " and " 'saw value' " in the Internet Computer itself.

Ocampo testified he first learned about ICP circa May 2021. Ocampo had no direct communications with Dfinity prior to his purchase of ICP tokens, but he viewed "extensive communications" in the form of promotional materials from Dfinity and its principals before making the purchases.

Specifically, Ocampo testified that he viewed interviews by Williams, Dfinity's director, in which Williams "was talking about the tech, and how they had a huge research and development team, and how the token was going to be the Internet Computer and was going to be able to help decentralize . . . the Internet in general, and it was . . . going to be pretty

15

much the next best thing in terms of technology." Ocampo also watched online presentations given by Williams "talking about the Internet Computer's research and development team, how they have a very different kind of coin that was going to be the next best thing next to . . . Bitcoin."

Ocampo also read various articles by Williams available on online platforms such as "CoinMarketCap, Messari, Coinbase, where they . . . give you a breakdown kind of who, what, when, where, how" and other "basic information" related to ICP. Ocampo viewed promotional material "touting the . . . technology and . . . how great the ICP was going to be" on a YouTube channel and in articles on Bloomberg. Ocampo did not identify any communications encouraging the purchases of ICP tokens with promises of returns on investments.

Ocampo used these promotional materials to "process whether [he] was going to put a large amount in ICP," as he ultimately decided to do when he made the ICP token purchases. However, putting aside the aforementioned publications and promotional materials viewed online, no one recommended to Ocampo that he buy ICP tokens.

## B. Relevant Caselaw

The trial court rejected Ocampo's solicitation argument based on *Jensen*, in which Division Two of this court interpreted solicitation liability under the Securities Act to require that " 'the seller must, at a minimum, directly communicate with the buyer.' " (*Jensen*, *supra*, 44 Cal.App.5th at pp. 649, 647.) In *Jensen*, the complaint alleged solicitation based on the respondents' advertising securities on their website, in media, and in guides and brochures published and mailed to investors. (*Id.* at p. 649.)

*Jensen* held that, because the complaint's "allegations appear to reflect general advertising and promotions of the product to the public rather than

direct or immediate solicitation of appellants' purchases," the complaint "fail[ed] to allege the necessary 'direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a [statutory] seller.' " (*Jensen, supra*, 44 Cal.App.5th at pp. 649–650.) In reaching that conclusion, the court cited caselaw from the First, Second, Third, and Fifth Circuit Courts of Appeals. (*Id.* at pp. 647, 649, citing *Rosenzweig v. Azurix Corp.* (5th Cir. 2003) 332 F.3d 854, 871; *In re Westinghouse Securities Litigation* (3d Cir. 1996) 90 F.3d 696, 717, fn. 19; *Shaw v. Digital Equipment Corp.* (1st Cir. 1996) 82 F.3d 1194, 1215, abrogated on other grounds by 15 U.S.C. § 78u–4(b)(2); *Capri v. Murphy* (2d Cir. 1988) 856 F.2d 473, 478–479.)

More recently, the Ninth and Eleventh Circuit Courts of Appeals held a complaint properly alleges sufficient facts to establish a plausible claim under the Securities Act, so as to withstand a motion to dismiss for failure to state a claim, where it alleges the defendant solicited a purchase by promoting the sale of a security in a mass communication to serve his or her own financial interest. (*Pino v. Cardone Capital, LLC* (9th Cir. 2022) 55 F.4th 1253, 1260 (*Pino*); *Wildes v. BitConnect International PLC* (11th Cir. 2022) 25 F.4th 1341, 1345–1347 (*Wildes*).)

In *Wildes*, the complaint alleged the solicitation included posting "thousands of YouTube videos extolling BitConnect," a Ponzi scheme involving the sale of a cryptocurrency, which were viewed millions of times. (*Wildes, supra*, 25 F.4th at pp. 1344, 1343.) It included websites where viewers were "encouraged . . . to buy" the coins, for example, telling "potential investors that passive income was merely 'a click away' "; "instruct[ing] investors to fill out a form to access a video about 'how to make huge profits' "; hosting "a course called Cryptocurrency 101, which culminated in lessons on how to create a BitConnect account and how to transfer bitcoin

17

there"; and "directing regional promoters to create videos about investing that always ended with a pitch for BitConnect." (*Id.* at p. 1344.) The Eleventh Circuit held that such "[b]roadly disseminated communications . . . convey[ed] a solicitation . . . consistent with the longstanding interpretation of the term" under the Securities Act. (*Wildes*, at p. 1346.) The court explained that, although "a person must 'urge or persuade' another to buy a particular security" for a solicitation to occur, neither *Pinter* nor the text of section 12 required "those efforts at persuasion [to] be personal or individualized." (*Wildes,* at pp. 1346, 1345.)

In *Pino*, the Ninth Circuit joined the Eleventh Circuit in holding that a complaint alleging promotion of a sale of securities via mass communication, even though not directed or targeted at a particular buyer, can state a claim for relief for soliciting a purchase within the meaning of the Securities Act. (*Pino*, *supra*, 55 F.4th at p. 1260.) The complaint in *Pino* alleged the defendants "engaged in extensive solicitation efforts, including through . . . a conference," as well as "extensive social media posts." (*Ibid.*) For example, the complaint described a YouTube video in which a defendant stated: " '[I]t doesn't matter whether [the investor] [is] accredited [or] non-accredited . . . you're gonna walk away with a 15% annualized return. If I'm in that deal for 10 years, you're gonna earn 150%." (*Id.* at p. 1256.) The complaint also "quote[d] several Instagram posts . . . regarding certain internal rates of return . . . , monthly distributions, and long-term appreciation," including a post in which a defendant asked potential investors, " 'Want to double your money[?]' and state[d] that an investor could receive $480,000 in cash flow after investing $1,000,000, achieve 'north of 15% returns after fees,' and obtain a '118% return amounting to 19.6% per year.' " (*Ibid.*)

With this legal backdrop in mind, we turn to whether the evidence in this case was sufficient to create triable issues of fact.

### C. Ocampo Failed To Raise an Issue of Triable Fact as to Solicitation Under Either *Jensen* or *Pino/Wildes*

Ocampo's claim that Dfinity solicited his ICP token purchases plainly fails under *Jensen* because he alleged general advertising and promotions by Dfinity and admitted in his deposition he did not have direct communication from Dfinity prior to his purchases. (See *Jensen*, *supra*, 44 Cal.App.5th at pp. 647, 649–650 [no section 12 solicitation where seller did not directly communicate with buyer].) As a result, Ocampo urges us to find *Jensen* "is no longer good law" and instead adopt the standard set forth in *Pino* and *Wildes*. We need not, and do not, decide between the two standards as the evidence before us does not establish a genuine issue of material fact as to solicitation under *either* standard.

Ocampo's testimony is clear that the solicitation claim rested solely on his viewing of promotional materials, specifically interviews, online presentations, and articles in which Williams touted the technology, research, and development of the Internet Computer itself, and talked about "how they have a very different kind of coin that was going to be the next best thing next to . . . Bitcoin." Although Ocampo contends these communications satisfy the solicitation prong under *Pino* and *Wildes*, we find otherwise as the alleged communications by Dfinity do *not* involve express, clear communications encouraging the purchases of the securities directly with promises of returns on investments.

The evidence in this case does not create a triable issue as to whether Dfinity " 'urge[d] or persuade[d]' " Ocampo to buy a particular security under *Wildes* or engaged in solicitation efforts akin to the advertised "internal rates

19

of return . . . , monthly distributions, and long-term appreciation" in *Pino*. (*Wildes*, *supra*, 25 F.4th at pp. 1346, 1345; *Pino*, *supra*, 55 F.4th at p. 1256.)

For example, in *Wildes*, the solicitation promised " 'huge profits' " and that "passive income was merely 'a click away.' " (*Wildes*, *supra*, 25 F.4th at p. 1344.) The persuasion was even more stark in *Pino*: YouTube and Instagram posts offered "a 15% annualized return" or 150 percent over 10 years (and sometimes higher rates of return), asked if investors wanted to double their money, and provided specific dollar amounts an investor could receive in cash flow after investing. (*Pino*, *supra*, 55 F.4th at p. 1256.)

By contrast, Ocampo does not point to any specific statements by Williams or Dfinity in which Ocampo (or anyone) was urged to buy ICP tokens with the express promise of receiving a return on his investment. Instead, the only evidence in the record indicates that Williams spoke highly of the technology at Dfinity as "the next best thing" and discussed the ICP token in relation to that technology. Further, while counsel for Ocampo pointed at oral argument to multiple paragraphs of the complaint that he asserted amounted to solicitation of ICP tokens, those paragraphs allege Dfinity was touting the Internet Computer *technology* and that sophisticated investors were backing the Internet Computer itself because they saw value in that technology. Although we recognize that this was not a selfless endeavor—Dfinity had some interest in the sale of ICP tokens—we decline to find that the facts of this case rise to the level of the "extensive solicitation efforts" specifically tethered to the sale of securities present in *Pino* and *Wildes*.[6] (See *Pino*, *supra*, 55 F.4th at p. 1260; *Wildes*, *supra*, 25 F.4th at

---

[6] At oral argument, counsel for Ocampo asserted Ocampo should be permitted to conduct further discovery regarding the solicitation of ICP tokens. Ocampo was already provided the opportunity to present evidence of solicitation based on what was publicly available and/or his personal

p. 1344.)  Therefore, under any standard, Ocampo did not present an issue of triable fact that Dfinity successfully solicited his purchase of ICP tokens within the meaning of the Securities Act.

In sum, Ocampo failed to meet his burden of presenting evidence raising triable issues of fact as to whether Dfinity was liable as a statutory seller for purposes of section 12 of the Securities Act.  Accordingly, we shall affirm.

**DISPOSITION**

The judgment is affirmed.  Dfinity is awarded costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

---

knowledge but failed to create a triable issue of fact.  We are not persuaded by counsel's unsupported assertions that Ocampo was unable to access solicitations (not directed at Ocampo) that would potentially create a triable issue.

PETROU, J.

WE CONCUR:

TUCHER, P. J.

RODRÍGUEZ, J.

A173226 / *Ocampo v. Dfinity*